# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 10-3130

———————

United States of America,　　　　　\*
　　　　　　　　　　　　　　　　\*
　　　　　　Appellee,　　　　　　\*
　　　　　　　　　　　　　　　　\*　Appeal from the United States
　　　v.　　　　　　　　　　　　\*　District Court for the
　　　　　　　　　　　　　　　　\*　District of Minnesota.
Larry Reynolds,　　　　　　　　　\*
　　　　　　　　　　　　　　　　\*
　　　　　　Appellant.　　　　　　\*

———————

Submitted:  March 17, 2011
Filed:   June 24, 2011

———————

Before WOLLMAN, MURPHY, and GRUENDER, Circuit Judges.

———————

WOLLMAN, Circuit Judge.

Larry Reynolds assisted Tom Petters in routing $12 billion in investor funds through Reynolds's company's California bank account. Petters had told investors that their funds were used to purchase consumer electronics, when in fact Reynolds directed that the funds be sent to Petters's company. Petters then used the funds to perpetrate a massive Ponzi scheme. Reynolds pleaded guilty to conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and was sentenced by the district court[1] to 130 months' imprisonment. Reynolds appeals from his sentence,

———————

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

arguing that the district court failed to adequately explain the sentence, failed to properly consider the sentencing factors set forth in 18 U.S.C. § 3553(a), assigned too much significance to irrelevant factors, and imposed a sentence greater than necessary to achieve federal sentencing goals. We affirm.

I.

Reynolds owned Nationwide International Resources, Inc. (Nationwide), a wholesale business that sold discounted shoes and clothing to retail outlets. In 2001, Petters, a Minnesota businessman who had purchased goods from Nationwide, approached Reynolds and asked if he could wire funds through Nationwide's bank accounts. Petters promised to pay Reynolds a fraction of a percent of the funds moving through the accounts. From 2002 until September 2008, Reynolds accepted and transferred $12 billion in investor funds, garnering $9.9 million for his role in Petters's scheme.

The scheme was a classic Ponzi scheme. Investors were told that their money would be used to purchase consumer electronics that would be sold to big box retailers at a substantial profit. Petters, along with his colleagues—including Deanna Coleman and Robert White—used fabricated documents that purported to show the purchase of goods from vendors and the resale of the goods to retailers. Other fabricated documents showed Petters's company wiring funds to the vendors, giving the appearance that the company was investing its own funds. Early investors realized a return on their investment, but that return came from funds from new investors, funds from legitimate transactions, and, in some cases, funds from their own investments.

Investors often wanted to send their investment funds directly to the vendor that was supplying Petters's company with consumer electronics, believing that by doing so they were ensuring against fraud, that is, guaranteeing that their funds were being

used to purchase merchandise. To this end, they wired their funds to the accounts of supposed vendors, Nationwide and Enchanted Family Buying Company, a company created by Michael Catain, in amounts that ranged from $2 million to $25 million. Reynolds and Catain then transferred the money to Petters's company and reaped a commission. Both knew that Petters had made false representations to investors and that investors believed that the funds were used for the purchase of merchandise.

Reynolds also assisted Petters in other ways. To show that Petters's company stored inventory, Reynolds helped secure warehouse space in California, Nevada, and Kansas. Reynolds also deceived an institutional investor about the quantity and value of certain inventory, claiming it to be greater than it actually was. Furthermore, Reynolds vouched for Petters's dealings and, on at least one occasion, pretended to be a significant supplier, thereby allaying an investor's concerns.

In September 2008, Coleman went to the U.S. Attorney's Office and revealed that she had assisted Petters in the execution of a multibillion-dollar Ponzi scheme that spanned more than ten years. She was fitted with a recording device and recorded hours of conversations with Petters, White, and Reynolds, among others, capturing discussions regarding the history and mechanics of the scheme and the plan to avoid responsibility if the fraud was discovered.

Reynolds was arrested on October 3, 2008, and pleaded guilty on October 23, 2008, two weeks after Coleman, White, and Catain had entered their guilty pleas. He was released on a $2.5 million bond, subject to electronic home monitoring and reporting to the U.S. Probation and Pretrial Services Office. Reynolds testified against Petters at trial, and it is undisputed that his testimony was helpful and was corroborated by recordings, documents, and other witnesses' testimony. Petters was found guilty and was sentenced to fifty years' imprisonment.

Following Petters's conviction, a presentence investigation report (PSR) was prepared for Reynolds. Reynolds had a total offense level of 37, a criminal history category of I, and an advisory sentencing range of 210 to 240 months' imprisonment, under the U.S. Sentencing Guidelines Manual (guidelines). Over Reynolds's objection, the PSR concluded that he was not entitled to a minor role reduction, pursuant to guidelines § 3B1.2, because he was not substantially less culpable than other participants. The PSR also set forth Reynolds's criminal and personal history. Although Reynolds's prior convictions were too old to warrant any criminal history points, he had had extensive past criminal dealings, including theft of property from insurance companies, conspiracy to possess with intent to distribute more than 1,000 pounds of marijuana, conspiracy to commit wire fraud, wire fraud, and interstate transportation of stolen property.

In his sentencing memorandum, Reynolds requested a forty-eight-month sentence. He argued that his offense level overstated his conduct and that he qualified for a minor or minimal role reduction. Reynolds compared his offense conduct to that of the other participants, arguing that he "was nothing more than the switchman of the washing machine in the money operation developed and fueled by Petters, Coleman, White and Wehmoff."[2] Moreover, he argued, he and Catain did not breach any fiduciary duty.

Reynolds further argued that a lighter sentence was warranted based on the assistance he had provided in the case against Petters and his cooperation in turning over significant assets for forfeiture. The government agreed that Reynolds had offered valuable assistance, noting that "Reynolds' quick guilty plea hastened the resolution of the criminal investigation" and that Reynolds had participated in at least eight interviews, testified before the grand jury, and "repeatedly reviewed bank

---

[2]James Wemhoff was an executive vice president at Petters's company from 2004 through 2007. He pleaded guilty to mail fraud and money laundering.

records, email, and business records, providing the government with valuable insights into the facts of a conspiracy that extended over a decade." Although the government did not move for a downward departure based on Reynolds's assistance pursuant to guidelines § 5K1.1, it urged the district court to consider Reynolds's cooperation and impose a sentence below the advisory sentencing range.

Nonetheless, the government maintained that Reynolds's involvement in Petters's scheme warranted severe punishment. Its sentencing memorandum detailed Reynolds's lengthy relationship with Petters: he began generating fake invoices for Petters in 1998; he later falsely certified that Petters was involved in legitimate merchandise deals; and he regularly carried out the transactions described above, laundering $12 billion over the course of almost seven years. According to the government, Reynolds's and Catain's money laundering allowed the Ponzi scheme to grow "from a million dollar fraud to a billion dollar fraud." The government argued that without the crucial assistance Reynolds provided to Petters, the scheme would have collapsed more quickly and fewer victims would have been defrauded.

At sentencing, Reynolds reiterated the arguments that his role was relatively minor and that his assistance was relatively great, when compared to the other participants in the Ponzi scheme. Reynolds asked that his age and health be considered in fashioning his sentence, that he be credited for the period of electronic home monitoring, and that he be given thirty days to surrender himself to the Bureau of Prisons. Following arguments by counsel and statements by Reynolds and his daughter, the district court imposed the 130-month sentence. It denied any credit for home monitoring, stating that such a request was a matter for the Bureau of Prisons to rule on, and ordered that Reynolds be taken into custody immediately.

II.

We review the reasonableness of a defendant's sentence under a "deferential abuse-of-discretion standard," ensuring that the district court committed no significant

procedural error and that the sentence is substantively reasonable. Gall v. United States, 552 U.S. 38, 41, 51 (2007); United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc).

A.

Reynolds argues that the district court committed procedural error when it failed to provide an adequate explanation for his sentence and when it characterized Reynolds as a "major player" in the scheme. Procedural error occurs when the district court fails to calculate (or improperly calculates) the guidelines range, treats the guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails to adequately explain the defendant's sentence. Gall, 552 U.S. at 51. Because he did not object at sentencing, we review Reynolds's challenges to the sentencing procedure for plain error. United States v. San-Miguel, 634 F.3d 471, 474-75 (8th Cir. 2011).

We conclude that the district court engaged in a sufficiently detailed explanation of its reasons for imposing the sentence in this case. As required by 18 U.S.C. § 3553(a)(1), it considered the nature and circumstances of the offense, providing, in part:

> [T]here's no question in my mind that you, Mr. Reynolds, are deserving of a lengthy sentence. I think your conduct here was serious and you were a major player in the—what is commonly known as the Petters fraud. I think without you or someone in the role you had, this could have collapsed maybe long ago; and . . . as it went on you did it for profit, for profit to yourself. And in doing that you knew exactly, I think, what you were doing and the wrongs that were being inflicted on others[.]

The district court also compared Reynolds's cooperation with Coleman's cooperation, finding that Coleman was "in a league by herself" and that the information she

-6-

provided was essential. Nonetheless, the district court determined that Reynolds provided "the equivalent of substantial assistance" and remarked that it was "going to factor that into the sentence I'm about to issue." Reynolds contends that the district court failed to explain why his sentence was greater than that imposed upon most of the scheme's participants, but the record is clear that the district court considered the other participants' conduct and sentences, remarking that Reynolds's sentence was "higher than the others, other than Mr. Petters. Probably higher than anyone else is going to get in this case. But I think under all the circumstances here it is required, at least as I read 3553(a)." Furthermore, in considering Reynolds's personal characteristics and criminal history, the district court noted that Reynolds had lived a life of crime.

In weighing the sentencing factors set forth in 18 U.S.C. § 3553(a)(2), the district court determined that although a guidelines range sentence was greater than necessary, a lengthy sentence was required to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. It discussed the sentencing goals of affording adequate deterrence and protecting the public from the types of fraud crimes that Reynolds had helped perpetrate. Given this detailed explanation, we conclude that the district court did not fail to adequately explain Reynolds's sentence, which was well below the guidelines range.

The district court's comment that Reynolds was a "major player" did not constitute a clearly erroneous finding. Reynolds had objected to the PSR's determination that he was an average participant and its denial of a minor role reduction under guidelines § 3B1.2. The district court adopted the finding that Reynolds was an average participant,[3] and its use of the term "major player" can properly be read as response to Reynolds's renewed request for a minor role reduction. Although the record reflects that there were participants who played a

---

[3]We note that neither the PSR nor the district court considered applying an aggravating role adjustment under guidelines § 3B1.1.

greater role than Reynolds and caused greater loss to the victims, the district court found that Reynolds's role was essential to the continued success of the scheme.

Finally, to the extent Reynolds argues that the district court failed to properly calculate his offense level, we find his argument to be without merit. Reynolds contends that his offense level overstates the seriousness of his offense because it is based on the amount of money he laundered, rather than the profits he garnered. Guidelines § 2S1.1(a)(2) instructs that the base offense level for money laundering is "8 plus the number of offense levels from the table in § 2B1.1 . . . corresponding to the value of the laundered funds." Accordingly, the PSR properly increased Reynolds's offense level based on the $12 billion in laundered funds, and we find no support for Reynolds's argument that its calculation should instead have been based on his $9.9 million profits.

B.

Reynolds argues that his sentence is substantively unreasonable because the district court failed to consider and properly weigh the sentencing factors. We consider the totality of the circumstances when reviewing the substantive reasonableness of a sentence, and we will not reverse absent a showing that the district court abused its discretion. Gall, 552 U.S. at 51. "A district court abuses its discretion when it fails to consider a relevant factor, gives significant weight to an irrelevant or improper factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case." San-Miguel, 634 F.3d at 475 (quoting United States v. Jones, 509 F.3d 911, 913 (8th Cir. 2007)); see also Gall, 552 U.S. at 59 (noting that the range of choice dictated by the facts of a case was significantly broadened after the guidelines became advisory). "The district court has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." San-Miguel, 634 F.3d at 476 (quoting United States v. Bridges, 569 F.3d 374, 379 (8th Cir. 2009)).

The district court did not commit a clear error of judgment when it considered Reynolds's criminal history. Although his prior convictions were from the 1970s and 1980s, and thus did not result in any criminal history points, Reynolds's criminal dealings suggest a pattern of unlawful, fraudulent behavior. The PSR set forth Reynolds's criminal history, and the district court heard the details of his prior criminal conduct during Reynolds's testimony in the Petters trial. That conduct included participating in check scams, creating fraudulent documents, and submitting false and inflated claims to insurance companies, both as an attorney and (after he was disbarred) as a business owner. Although Reynolds owned and operated legitimate businesses from the mid-1980s through the 1990s, he also engaged in some fraudulent activity during that time period and returned to crime in 2001 when presented by Petters with a fast-money opportunity. The district court thus acted within its discretion when it considered Reynolds's criminal history.

Reynolds also contends that the disparate sentences among the participants—ranging from probation to fifty years' imprisonment—demonstrate the unreasonableness of his sentence. To show an unwarranted disparity between Reynolds's sentence and the sentences of the other participants, Reynolds and the other participants "must have 'similar records' and must 'have been found guilty of similar conduct.'" United States v. Frausto, 636 F.3d 992, 997 (8th Cir. 2011) (quoting 18 U.S.C. § 3553(a)(6)). Reynolds, however, is not similarly situated to the other participants. Of the participants, Reynolds and Catain served similar roles. Both were found guilty of similar conduct, and Catain was sentenced to 90 months' imprisonment. Reynolds, however, offered Petters assistance beyond laundering funds and had a lengthy criminal record. Moreover, Catain pleaded guilty and began cooperating with the government before Reynolds did. Thus, the disparity in the length of their sentences was not unwarranted.

Finally, the district court was well aware of Reynolds's age and health, the time he had spent on home detention, and the assistance he had provided to the government in its case against Petters. The fact that it had presided over the Petters trial and had

sentenced the other participants gave the district court a comprehensive view of the scheme, the relative culpability of its participants, and the extent, timeliness, and value of their cooperation with the government.

In summary, we conclude that Reynolds's sentence does not transgress the parsimony principle set forth in 18 U.S.C. § 3553(a) and that his sentence is not substantively unreasonable.

III.

The sentence is affirmed.

_____