# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3526

_____

United States of America,       *
      *
        Appellee,       *
      *    Appeal from the United States
      v.       *    District Court for the
      *    Eastern District of Missouri.
William J. Mabie,       *
      *
        Appellant.       *

_____

Submitted: September 20, 2011
Filed: December 2, 2011

_____

Before MELLOY, SMITH, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury found William Mabie guilty of three counts of mailing threatening communications, in violation of 18 U.S.C. § 876(c), and one count of interstate communication of a threat, in violation of 18 U.S.C. § 875(c). The district court[1] sentenced Mabie to 88 months' imprisonment. Mabie appeals both his conviction and sentence, arguing that (1) the district court violated his right to self-representation, (2) the district court abused its discretion in quashing the witness subpoenas that Mabie requested, (3) insufficient evidence exists to support his convictions, (4) Mabie's

---

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

conviction under § 876(c) violates his First Amendment rights, (5) the district court erred in assessing a two-level obstruction-of-justice enhancement, and (6) Mabie's sentence is unreasonable. We affirm.

## I. *Background*

On July 23, 2009, a federal grand jury returned a superceding indictment charging Mabie with seven counts of making threatening communications. Mabie requested to proceed pro se, and, on April 22, 2010, the district court granted Mabie's request. Mabie filed a number of pro se motions for witness subpoenas. The district court held two hearings in which it determined, among other things, whether and to whom subpoenas should be issued. In a hearing before the court on May 7, 2010, Mabie repeatedly interrupted the court and prosecutor. In another hearing on June 23 and 24, 2010, Mabie accused the court of lying, demonstrated a lack of decorum, and ultimately refused to participate in the proceedings. At the conclusion of the hearing, the district court authorized the issuance of witness subpoenas to 42 proposed witnesses, and soon thereafter Mabie dispatched a series of letters in which he openly boasted of using the court's subpoena power for the purpose of harassing proposed witnesses and their families and offered to drop the subpoenas if he was paid $21,000.

On July 14, 2010, the government filed motions to revoke Mabie's pro se status and to quash his numerous trial subpoenas. Following a hearing, the district court granted the government's motion to revoke and granted in part and denied in part the motion to quash. In its opinion, the district court noted that, "when given authority to request subpoenas, [Mabie] has abused the process afforded to him. He has made open and veiled threats to some proposed witnesses and attempted to solicit money in exchange for withdrawing subpoenas." The court also noted that Mabie was "intent on pursuing theories that will consistently be disallowed, and he becomes openly hostile and inattentive to rulings and objections. He . . . has demonstrated serious abuse of court empowerment." The district court quashed subpoenas to 34 of Mabie's proposed witnesses.

Trial evidence showed that Mabie worked for Affordable Towing in St. Louis, Missouri, until the spring of 2007. After that job ended, Mabie made phone calls and sent letters to Steve Reisch, the owner of Affordable Towing. Mabie demanded the return of tools and a toolbox that he had left at the business. In July 2008, Mabie sent an anonymous letter to Reisch's elderly mother, Betty Reisch, at her unlisted home address in Kirkwood, Missouri. In the letter, Mabie accused her "pothead son" of stealing from him and stated that

> the only way he could get away with it is if no one knows who did it, and the ACTUAL owner is not ready to put several bullets in his head and his kids and grandkids heads.
>
> This is a problem, as it would take hours to clean up the blood.

Betty Reisch had only one son, Steve Reisch, and the letter was signed in the name of her deceased husband, Forrest Reisch. Betty Reisch testified that she had no idea who sent the letter and that she was "very much" afraid when she received it. Steve Reisch reported the letter to police.

Mabie made objectionable communications to a number of other people. Mabie called Steve Reisch's friend, Lieutenant Mike Deeba of the St. Louis Metropolitan Police Department (SLMPD). In one voice message left on Lieutenant Deeba's office phone, Mabie suggested that someone should check on Lieutenant Deeba because he "might be up in his office hanging himself or committing suicide." In another message, Mabie declared that June 5 was "Charles Deeba's birthday, or would be if he was still alive. Funny how I know things like this isn't it. . . . See you in Greenville." Charles Deeba was Lieutenant Deeba's deceased uncle, and at the time Lieutenant Deeba and his family lived in Greenville, Illinois. Mabie also spoke with Sergeant Al Klein of the SLMPD, who asked Mabie to stop contacting Lieutenant Deeba. Mabie told Sergeant Klein, "I was right there in Barnes Hospital when . . . Sergeant Dodge brought in a [sic] Bob Stanze. With that cemetery blue look. I think

Deeba would look about right that color. I can hit what I'm aiming at for 400 f---ing yards." Bob Stanze was a SLMPD officer who was fatally shot in the line of duty. On August 4, 2008, Mabie told Sergeant Klein over the phone that if Sergeant Klein did not investigate Lieutenant Deeba, Mabie would confront Lieutenant Deeba's wife. Mabie also called Sergeant Tony Brooks of the Greenville Police Department and told him that Lieutenant Deeba had challenged him to a gun fight:

> But like I told him, that St. Louis police thinks a gun fight [is] at 15 yards. I'm, I'm from down here [in] Festus[, Missouri]. I think they should be about 300. I'm fighting at 300, I don't think they can make it at 15. So, anyway, yeah keep your eye on [Lieutenant Deeba's] address though I serious[ly] doubt that[ ] it['s] going to be a tranquil area much longer.

Sergeant Brooks went immediately to Lieutenant Deeba's residence and conducted a search of the property. Lieutenant Deeba also went to Greenville and instructed his wife and children on how to use firearms. That same day, officers from the Jefferson County, Missouri Sheriff's Office went to Mabie's home and placed him under arrest. Prior to his arrest, Mabie stated that he could shoot Lieutenant Deeba at 600 yards.

At trial, the government also presented evidence of letters that Mabie had sent to two Franklin County, Missouri prosecutors. Mabie sent a handwritten letter to Franklin County Prosecutor Rodney McKinney, who had prosecuted Mabie in 2004. This letter, sent to McKinney's unlisted home address and dated February 12, 2009, accused McKinney of "helping car thieves" and told McKinney to admit that he had lied or Mabie would "stop by some evening, so we can work toward justice." McKinney, who had been the target of a derogatory flier that Mabie circulated following the 2004 prosecution, testified at trial that he thought this was an escalation in Mabie's behavior and that he perceived that last statement as a threat. The letter prompted McKinney to immediately contact the police.

On February 21, 2008, Franklin County Assistant Prosecutor Mary Choi, who had prosecuted Mabie in 2006, also received a letter from Mabie. Mabie accused Choi of prosecutorial misconduct and demanded that she "take corrective action." The letter concluded: "A cornerstone of this society (for which countless have died) is a fair Justice system, honesty is essential, correct your mistakes / without delay or suffer the consequences." Choi testified that she perceived this last sentence as a threat to harm her. She also believed that Mabie "was not a stable individual and was obsessed with harassing people." As a precaution, Choi alerted security at the courthouse where she worked of Mabie's comments and her concerns. Choi also received two additional letters from Mabie at her unlisted home address, which were derogatory and disturbing in nature. One letter, which was addressed to her husband, stated: "If Mary . . . makes things right, she may have a happy life, but if she does not, these lies will follow her forever, I AM ABSOLUTELY SURE IT WILL."

At trial, Mabie took the stand in his defense and testified that he did not intend to harm anyone, did not dislike Mary Choi, and only wanted to "make things right." Mabie was convicted of three counts of mailing threatening communications, in violation of 18 U.S.C. § 876(c), and one count of interstate communication of a threat, in violation of 18 U.S.C. § 875(c). On October 4, 2010, Mabie filed a pro se motion to restore his right of self-representation, which the district court denied. At Mabie's sentencing hearing on November 10, 2010, Mabie objected to a two-level enhancement for obstruction of justice on each count. The district court determined that the enhancement applied and sentenced Mabie to 88 months' imprisonment.

II. *Discussion*

Mabie raises six issues on appeal. He contends that (1) the district court violated his right to self-representation, (2) the district court abused its discretion in quashing the witness subpoenas that Mabie requested, (3) insufficient evidence exists to support his convictions, (4) Mabie's conviction under § 876(c) violates his First Amendment

rights, (5) the district court erred in assessing a two-level obstruction-of-justice enhancement, and (6) Mabie's sentence is unreasonable.

## A. *Right to Self-Representation*

First, Mabie argues that his pretrial actions did not rise to the level of disruption that would warrant revocation of his pro se status, and even if they did, the district court's failure to warn Mabie that his right to self-representation could be revoked or to use any less restrictive means prior to reinstating counsel violated his right to self-representation. "We review the district court's decision *de novo*." *United States v. Mosley*, 607 F.3d 555, 558 (8th Cir. 2010).

While a defendant's right to self-representation is a highly valued right, *Faretta v. California*, 422 U.S. 806, 819 (1975), it "is not absolute," *Indiana v. Edwards*, 554 U.S. 164, 171 (2008). "[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Faretta*, 422 U.S. at 834 n.46. "The right of self-representation is not a license to abuse the dignity of the courtroom" or "a license not to comply with relevant rules of procedural and substantive law." *Id.*; *see also United States v. Edelmann*, 458 F.3d 791, 808–09 (8th Cir. 2006) ("'The right [to self-representation] does not exist . . . to be used as a tactic for delay, for disruption, for distortion of the system, or for manipulation of the trial process.'") (quoting *United States v. Frazier-El*, 204 F.3d 553, 560 (4th Cir. 2000)).

This case resembles *Mosley*, where we determined that the revocation of a defendant's pro se status was warranted. 607 F.3d at 559. In that case, the defendant had filed a number of unintelligible and frivolous pro se pleadings and motions in the district court and had demonstrated an unwillingness to participate in pretrial proceedings. *Id.* at 557–58. We found that the defendant's behavior "interfered with pretrial proceedings and delayed the trial" and that "[t]here was good cause to believe that [the defendant] would continue to disrupt the proceedings if the court permitted

him to resume self-representation." *Id.* at 559; *see also United States v. Gabrion*, 648 F.3d 307, 331–32 (6th Cir. 2011) (finding that a defendant who was particularly disruptive in pretrial hearings was not entitled to proceed pro se "[g]iven the totality of [his] disruptive behavior," which included being "persistently disruptive and deeply disrespectful in court," "fil[ing] numerous bizarre motions and letters," and "committ[ing] forty major infractions while incarcerated").

As in *Mosley*, the totality of Mabie's disruptive behavior provided the district court with sufficient grounds to revoke his pro se status. We find no error in the district court's revocation of Mabie's pro se status. In pretrial hearings, Mabie repeatedly disrupted the proceedings and was openly hostile, disrespectful to the court, and inattentive. Mabie also sought to use the court's subpoena power to dissuade potential witnesses. *See United States v. Myers*, 503 F.3d 676, 680–81 (8th Cir. 2007) (determining that a pro se defendant who "made hundreds of *pro se* filings, many frivolous or repetitive," and sent "threatening letters . . . to the Magistrate Judge and the Assistant United States Attorney during the litigation" had "engage[d] in serious obstructionist misconduct"). In a hearing on April 22, 2010, the district court informed Mabie that he would be held to the same rules as an attorney if he proceeded pro se. We find no merit in Mabie's argument that he was entitled to a more specific warning before his right to self-representation was revoked or that the district court was required to employ a less-restrictive means prior to reinstating counsel.[2]

---

[2]Mabie cites to *United States v. Dougherty*, 473 F.2d 1113, 1125 (D.C. Cir. 1972), for the proposition that a "potentially unruly defendant may and should be clearly forewarned that deliberate dilatory or obstructive behavior may operate in effect as a waiver of his pro se rights." Although this language appears in *Dougherty*, the court in that case was merely describing the role of standby counsel when a pro se litigant is representing himself in court. *Id.* (explaining the line an amicus attorney must walk between playing "a too conspicuous role" and "assum[ing] exclusive control of the defense" in the event that the defendant's pro se status is revoked). Mabie takes out of context the idea that the defendant must be given a warning before his right to self-representation is revoked.

Nor did the district court err when it denied Mabie's request to proceed pro se during sentencing. On August 3, 2010, two weeks before trial, Mabie sent a letter to his attorney, in which he asked, "IS THE ONLY WAY TO GET YOU OFF THIS CASE IS TO PHYSICALLY ASSAULT YOU IN THE COURTROOM? This case is my entire life, if I have to go there I will[.]" As a result of the letter, the district court arranged sua sponte for Mabie to wear a stun belt during trial, and the court cautioned Mabie's attorney to stay a safe distance from Mabie during the trial. Based on Mabie's misconduct throughout the course of the litigation and even up to the trial itself, the district court had ample reason to believe that Mabie's noncompliance with the relevant rules of procedure and substantive law would continue during sentencing.

B. *Request for Subpoenas*

Mabie also argues that the district court abused its discretion when it granted the government's motion to quash 34 of Mabie's witness subpoenas and that quashing the subpoenas violated his Fifth and Sixth Amendment rights.

A district court's decision to quash subpoenas is reviewed for an abuse of discretion. *United States v. Bueno*, 443 F.3d 1017, 1026 (8th Cir. 2006). "The burden is upon the requesting party to show that the desired witnesses are necessary to an adequate defense, and reversal is only appropriate if 'the exceptional circumstances of the case indicate that the defendant's right to a complete, adequate and fair trial is jeopardized.'" *United States v. Hang*, 75 F.3d 1275, 1282–83 (finding that defendant failed to establish that a witness's presence at trial was necessary to an adequate defense) (quoting *United States v. Wyman*, 724 F.2d 684, 686 (8th Cir. 1984)). "Mere allegations of materiality and necessity are not sufficient to establish that a witness is necessary to an adequate defense." *United States v. LeAmous*, 754 F.2d 795, 798 (8th Cir. 1985).

In ex parte hearings conducted before the district court on May 7, 2010, and June 23 and 24, 2010, the district court gave Mabie the opportunity to justify a

subpoena for each proposed witness. On July 20, 2010, Mabie requested additional subpoenas, some of which the government challenged, and Mabie again had the opportunity to support those subpoena requests. Mabie's proffered reasons fell well short of providing exculpatory evidence. Mabie alleged that a few of the proposed witnesses would have testified that he was trying to resolve the conflict with his former employer properly; however, he did not establish how such testimony would have affected the outcome of his case. *Cf. United States v. Blade*, 336 F.3d 754, 758–59 (8th Cir. 2003) (finding that a lower court did not abuse its discretion in refusing to issue a subpoena because, even if the testimony of one witness may have been relevant and material to the case, "the magistrate judge can hardly be faulted for failing to root out the request for the [one relevant witness], buried in subpoena requests for thirty-three mostly irrelevant witnesses"). The district court neither abused its discretion nor violated Mabie's Fifth or Sixth Amendment rights by quashing the subpoenas. *See United States v. Rubin*, 836 F.2d 1096, 1101 (8th Cir. 1988) (finding that the exclusion of evidence that was neither necessary to prevent a fair trial nor favorable to the defense did not violate the defendant's constitutional rights).

## C. *Sufficiency of the Evidence*

Mabie contends that no reasonable jury could have found that each of the four communications for which he was convicted contained a true threat in violation of 18 U.S.C. §§ 875(c) or 876(c). A "true threat" is defined as a "statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another." *Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616, 624 (8th Cir. 2002) (en banc). Mabie cites *United States v. Barcley* for the proposition that a communication that contains language "which is equally susceptible of two interpretations, one threatening, and the other nonthreatening," is not a true threat unless the government offers evidence "serving to remove that ambiguity." 452 F.2d 930, 933 (8th Cir. 1971). In *Barcley*, we concluded that the trial court should have directed a verdict of acquittal because the defendant's letter to his attorney did not

contain a true threat. *Id.* at 934. The letter stated, "'[A]s soon as I can get this case situated around in the position I want you are the first S.O.B. that will go, [the prosecutor] will [be] next.'" *Id.* at 932. Mabie argues that, just like the letter in *Barcley*, the communications involved in this case are subject to multiple interpretations, some of which are nonthreatening.

*Barcley* is distinguishable. First, in evaluating the sufficiency of the evidence in *Barcley*, "we [were] mindful that the letter communicated a client's dissatisfaction with the services of his attorney," a communication which falls within the purview of the First Amendment. *Id.* at 933. Second, neither Barcley's attorney nor the prosecutor referenced in the letter testified that they experienced fear upon reading the letter. *Id.* at 934. In order to decide whether there is sufficient evidence from which the jury can find that a reasonable recipient would interpret a communication as a threat, "the communication must be viewed in 'textual context and also in the context of the totality of the circumstances in which the communication was made.'" *United States v. Floyd*, 458 F.3d 844, 849 (8th Cir. 2006) (finding that anonymous, photocopied newspaper articles about a judge's murdered family with the phrase "Be Aware Be Fair" written on the top and sent to judicial officers constituted a true threat and was distinguishable from the communication in *Barcley*) (quoting *United States v. Bellrichard*, 994 F.2d 1318, 1323 (8th Cir. 1993)). In *Barcley*, we were careful to consider the context in which the letter was written and determined that, within that context, the letter was not a threat. 452 F.2d at 934.

Material differences in both the content and context of the communications distinguish those that Mabie made from those that Barcley made. Mabie's July 2, 2008 letter to Betty Reisch at her unlisted home address that was signed in the name of her deceased husband accused Mrs. Reisch's son of stealing and stated that he could get away with it only if "the ACTUAL owner [was] not ready to put several bullets in [his] head and his kids and grandkids heads." The letter continued, "This is a problem,

as it would take hours to clean up the blood." Mrs. Reisch testified at trial that she was "very much" afraid when she received it.

Mabie's August 4, 2008 telephone conversation with Sergeant Brooks followed a series of phone calls and messages to Lieutenant Deeba that had escalated in tone and hostility. Mabie suggested that he knew where Lieutenant Deeba lived even though Lieutenant Deeba's home address was unlisted, made references to Lieutenant Deeba's wife by name, and suggested that he wanted to engage Lieutenant Deeba in a "gun fight" with a high-powered rifle. After Mabie's phone conversation with Sergeant Brooks, the Greenville Police Department searched Lieutenant Deeba's property, and Lieutenant Deeba instructed his wife and children on how to use firearms in the event that Mabie attacked them.

Mabie's February 21, 2008 letter to Prosecutor Choi, which was sent to her new workplace in a different county several years after she prosecuted Mabie, also constituted a true threat. Choi testified that she perceived the letter as a threat in part because she was aware that Mabie was "not a stable individual." She shared the letter with several coworkers and notified security at her office to be mindful of Mabie. Choi also received two subsequent letters at her home address, one which was addressed to her husband and stated, "If Mary . . . makes things right, she may have a happy life, but if she does not, these lies will follow her forever, I AM ABSOLUTELY SURE IT WILL."

Finally, Mabie's February 12, 2009 letter to Prosecutor McKinney, which was sent to his home address years after McKinney's prosecution of Mabie, accused McKinney of prosecutorial misconduct, demanded that McKinney admit to it, and concluded, "If I don't hear from you, I'll stop by some evening, so we can work toward justice." McKinney stated at trial that he perceived this statement as a threat, and he alerted the St. Louis County Police Department soon after reading the letter.

The content of these four communications examined in the context in which they were made could enable a reasonable jury to find that each communication constituted a true threat under the law.

### D. *First Amendment Challenge*

Mabie also alleges that 18 U.S.C. § 876(c) violates the First Amendment because it is unconstitutionally overbroad and vague. Mabie argues that the statute is overbroad because it does not require a finding that the defendant actually intended the communication to be a threat. Mabie argues that the statute is vague because it fails to define the term "knowingly."

### 1. *Overbreadth Challenge*

Mabie concedes that the First Amendment does not afford protection against prosecution for true threats. He argues that the statute at issue is not limited to true threats because it does not require a finding that the defendant actually intended to communicate a threat. In support of his argument, Mabie cites *Virginia v. Black*, 538 U.S. 343, 359 (2003). *Black* involved a Virginia law banning cross burning. In *Black,* the Supreme Court noted that "'[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* Notably, the *Black* Court did not hold that the speaker's subjective intent to intimidate or threaten is required in order for a communication to constitute a true threat. Rather, the Court determined that the statute at issue in *Black* was unconstitutional because the intent element that was included in the statute was effectively eliminated by the statute's provision rendering any burning of a cross on the property of another prima facie evidence of an intent to intimidate. *Id.* at 366. "Because the . . . presumption obviated the need to establish either subjective or objective intent, one simply cannot tell whether the statute would have passed muster if it had included a reasonable person standard for determining whether the cross burner had an intent to intimidate." Mark

-12-

Strasser, *Advocacy, True Threats, and the First Amendment*, 38 Hastings Const. L.Q. 339, 377 (2011).

We have never expressly stated that a defendant's subjective intent to threaten is not a necessary element of a true threat analysis. *Cf. Floyd*, 458 F.3d at 848 ("There has been no First Amendment challenge in this case, and on that basis alone, *Black* is distinguishable.") (footnote omitted). Nonetheless, we *have* adopted an objective test for determining whether a communication is a true threat. This objective test, which has been applied repeatedly since *Black*, does not consider the subjective intent of the speaker. *See, e.g.*, *United States v. Beale*, 620 F.3d 856, 865 (8th Cir. 2010) (defining a "true threat" as "'a statement that a reasonable recipient would have interpreted as a serious expression of an intent to harm or cause injury to another'" (quoting *Pulaski Cnty. Special Sch. Dist.*, 306 F.3d at 624)); *United States v. Jongewaard*, 567 F.3d 336, 339 n.2 (8th Cir. 2009) (same); *Riehm v. Engelking*, 538 F.3d 952, 963 (8th Cir. 2008) (same); *cf. United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009) (applying an objective test in a true threat analysis); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 616-17 (5th Cir. 2004) ("[T]o lose the protection of the First Amendment and be lawfully punished, the threat must be intentionally or knowingly *communicated* to either the object of the threat or a third person."); *United States v. Zavrel*, 384 F.3d 130, 136 (3d Cir. 2004) (applying an objective test in a true threat analysis). *But see United States v. Parr*, 545 F.3d 491, 500 (7th Cir. 2008) (declining to decide the issue but noting that "[i]t is more likely . . . that an entirely objective definition [of a true threat] is no longer tenable"); *United States v. Cassel*, 408 F.3d 622, 633 (9th Cir. 2005) ("[S]peech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat.").

The government need not prove that Mabie had a subjective intent to intimidate or threaten in order to establish that his communications constituted true threats. Rather, the government need only prove that a reasonable person would have found that Mabie's communications conveyed an intent to cause harm or injury. *Cf. United*

*States v. White*, No. 7:08-CR-00054, 2010 WL 438088, at \*8 (W.D. Va. Feb. 4, 2010) (slip copy) (stating that the public policy rationale outlined in *Black* for prohibiting true threats supports this objective test because, "[i]f the prohibition on true threats is meant to protect listeners from the 'fear of violence' and the corresponding 'disruption that fear engenders,' then the subjective intent of the speaker can not [sic] be of paramount importance" (quoting *Black*, 538 U.S. at 360)); *New York ex rel. Spitzer v. Cain*, 418 F. Supp. 2d 457, 479 (S.D.N.Y. 2006) ("A standard for threats that focused on the speaker's subjective intent to the exclusion of the effect of the statement on the listener would be dangerously underinclusive with respect to the first two rationales [in *Black*] for the exemption of threats from protected speech."). Thus, 18 U.S.C. § 876(c), which does not require a finding that the defendant actually intended to threaten the recipient, is not unconstitutionally overbroad.

### 2. *Vagueness Challenge*

The statute is not void for vagueness either. The void-for-vagueness doctrine protects persons by providing "fair notice" of a statute's applicability and by preventing "arbitrary and discriminatory prosecutions" of a statute's enforcement. *Skilling v. United States*, 130 S. Ct. 2896, 2933 (2010). "The vagueness doctrine recognizes that '[a] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *United States v. Birbragher*, 603 F.3d 478, 484 (8th Cir. 2010) (quoting *United States v. Washam*, 312 F.3d 926, 969 (8th Cir. 2002)). "'Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.'" *Washam*, 312 F.3d at 929 (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32–33 (1963)).

18 U.S.C. § 876(c) provides:

Whoever *knowingly* so deposits or causes to be delivered as aforesaid, any communication with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to kidnap any person or any threat to injure the person of the addressee or of another, shall be fined under this title or imprisoned not more than five years, or both.

(Emphasis added.) In *Floyd*, we recognized that 18 U.S.C. § 876(c) is "somewhat ambiguous with regard to what the word 'knowingly' modifies." 458 F.3d at 848 n.3. "Arguably, the 'knowingly' language could modify all the elements of the statute–requiring that the sender not only 'knowingly' used the mails to send the letter, but also that the sender 'knew' that the letter contained threatening language." *Id.* (citing *Liparota v. United States*, 471 U.S. 419, 424–25 (1985)). *Floyd* did not address a First Amendment challenge, however, and we have consistently interpreted the statute as requiring only proof that the sender knowingly sent the communications—not that the sender knowingly threatened the recipient or another. *See, e.g.*, *id.* at 847 ("The statute requires only that the sender intended to mail the letter . . . not that the sender intended to threaten the recipient."); *United States v. Lincoln*, 589 F.2d 379, 381 (8th Cir. 1979) (finding that the statute required proof of two elements: "(1) that the defendant wrote a threatening letter and (2) that the defendant knowingly caused the letter to be forwarded by the United States mail"); *cf. United States v. Rendelman*, 641 F.3d 36, 46 (4th Cir. 2011) ("Section 876(c) merely requires proof that the accused knowingly mailed the threatening communication, not that he also intended to threaten the person of the recipient thereof."). *But see United States v. King*, 122 F.3d 808, 811 (9th Cir. 1997) (finding that the statute requires a specific intent to threaten).

Our prior interpretations of § 876(c) comport with a plain reading of the statute. The word "knowingly" appears in the statute at the beginning of the text and is separated from any language about the threatening nature of the communication. Also, the phrase "knowingly so deposits or causes to be delivered as aforesaid" is followed

by a comma, setting it off from the subsequent text. Finally, "*any* communication . . . containing any threat" is covered by the provision. There is nothing in the language of the statute to suggest that the threat contained must be one that the defendant intended to make. For all of these reasons, we find that § 876(c) is not unconstitutionally vague.

### E. *Obstruction-of-Justice Enhancement*

Next, Mabie contends that the district court improperly assessed a two-point enhancement for obstruction of justice. Mabie contends the district court erred by finding that Mabie willfully gave false testimony at trial. "We review a district court's factual findings underlying an obstruction of justice enhancement for clear error and its construction and application of the guidelines de novo." *United States v. Mendoza-Gonzalez*, 363 F.3d 788, 796 (8th Cir. 2004). "A defendant is subject to an enhancement under U.S.S.G. § 3C1.1 if he testifies falsely under oath in regard to a material matter and does so willfully rather than out of confusion or mistake." *Id.* "If a defendant objects to an obstruction enhancement relying on perjury, the district court must make findings that the defendant willfully gave false testimony concerning material matters in the case." *Id.*

Mabie testified at trial that the four communications for which he was convicted were not intended as threats; rather, Mabie said that he was trying to stop certain crimes from occurring and "get things back on the right track." Mabie also testified that Lieutenant Deeba had challenged him to a gunfight but that Mabie did not want any part of it. Finally, he stated that he did not dislike Choi and that she shared his views that the Franklin County prosecutors were corrupt. At sentencing, the district court determined that Mabie testified falsely regarding his motives for making the threatening communications, his conversations with Lieutenant Deeba concerning the gunfight, and his relationship with Choi. According to the court, "[t]hose facts become material because he is trying to mischaracterize the threats he made."

-16-

In light of "the district court's superior position from which to judge credibility," *United States v. Stulock*, 308 F.3d 922, 926 (8th Cir. 2002), as well as ample proof that Mabie made his communications for reasons other than those he declared at trial, we cannot find that the district court clearly erred in assessing an obstruction-of-justice enhancement on each of the four counts for which Mabie was convicted. *Cf. Floyd*, 458 F.3d at 850 (affirming an obstruction-of-justice enhancement because the district court found that defendant perjured herself when she stated that she sent the communication for a reason other than to threaten the recipient).

F. *Reasonableness of the Sentence*

Finally, Mabie contends that a Guidelines sentence of 88 months' imprisonment is unreasonable in this case because the district court failed to consider that Mabie did not have a violent criminal history, that he behaved extremely well at trial, that the threats he made were mild and indirect, and that no one suffered physical harm as a result of his conduct. We review the reasonableness of a defendant's sentence for an abuse of discretion. *United States v. Reynolds*, 643 F.3d 1130, 1134 (8th Cir. 2011) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc)). A sentence within a properly calculated Guidelines range is presumptively reasonable on appeal. *United States v. Borromeo*, 657 F.3d 754, 756 (8th Cir. 2011).

The district court did not abuse its discretion in sentencing Mabie to a term of 88 months' imprisonment. The district court considered the entirety of Mabie's criminal record, which includes two convictions for harassment to frighten or disturb another person, an undated charge of harassment to frighten or disturb, and a conviction for third-degree assault and first-degree trespassing. The district court also made reference to Mabie's courtroom behavior in pronouncing the sentence: "[W]hile Mr. Mabie is a highly intelligent individual," "there is something about this case that [is] hard . . . to explain. . . . [I]t can be done in talking about the irrational approach he

takes and the lack of willingness to move on and really focus on the harm done." Mabie contends that the court erred by failing to consider his good behavior during trial. The district court was mindful, however, that Mabie's good behavior during trial may not have been entirely due to his desire to excel in deportment but perhaps also due to the stun belt that he wore throughout the course of the trial. The district court also considered the nature of Mabie's threatening communications and the resulting harm that they inflicted:

> [W]hile no physical harm is traceable to the offenses, the emotional harm is very substantial in this case. I had an opportunity to see the various victims testifying in this case, and their lives have been changed by—by these threats. They made a real impact on me in terms of the emotional toll, the clarity with which the various victims recalled all of the incidents and how it impacted them. So while there has been no physical harm caused, the emotional strain has been very, very substantial in this case. So these are serious offenses . . . .

The district court took into consideration all of the relevant factors in sentencing and imposed a sentence to reflect the seriousness of the offenses, to provide adequate deterrence, to protect the public from further crimes, and to provide Mabie with needed training and treatment. *See* 18 U.S.C. § 3553(a). The court did not abuse its discretion by imposing a Guidelines sentence of 88 months' imprisonment.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____