UNITED STATES of America, Plaintiff,

v.

**Angel AMAYA, Defendant.**

**No. CR11–4065–MWB.**

United States District Court, N.D. Iowa, Western Division.

June 11, 2013.

898

Robert A. Knief, U.S. Attorney's Office, Sioux City, IA, for Plaintiff.

R. Scott Rhinehart, Rhinehart Law, PC, Sioux City, IA, for Defendant.

### SENTENCING OPINION AND STATEMENT OF REASONS PURSUANT TO 18 U.S.C. § 3553(c)

MARK W. BENNETT, District Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ................................................... 899
   A. *The Charges* ................................................ 899
   B. *The Trials* ................................................. 899
   C. *The Sentencing Hearing* ..................................... 900

II. *LEGAL ANALYSIS* ............................................... 900
   A. *Sentencing Methodology: Computing the Guideline Range; Departures; and Variances* ........................................ 900
   B. *Step 1–Determining The Guideline Range* ..................... 902
      1. *Amaya's objections to the PSR* ......................... 903
         a. *Aggravating role in the offense* ................... 903
         b. *Using a minor* ..................................... 907
         c. *Obstruction of justice* ............................ 907
         d. *Acceptance of responsibility* ...................... 912
      2. *Offense level computation* ............................. 913
   C. *Step 2—Determination Of Whether To Depart* .................. 914
   D. *Step 3—Application Of The § 3553(a) Factors* ................ 914
      1. *Overview of § 3553(a) factors* ......................... 914
      2. *Nature and circumstances of the offense* ............... 915
      3. *Amaya's history and characteristics* ................... 917
      4. *The need for the sentence imposed* ..................... 917
      5. *The kinds of sentences available* ...................... 919
      6. *Any pertinent policy statement* ........................ 919
      7. *The need to avoid unwarranted sentencing disparity* ..... 919
      8. *The need to provide restitution* ....................... 921
      9. *Double jeopardy violation* ............................. 921
      10. *Consideration* ........................................ 921

*III. CONCLUSION* ................................................... 922

Defendant Angel Amaya came before me for sentencing on June 11, 2013, after being convicted by a jury of conspiring to possess with intent to distribute 50 grams or more of pure methamphetamine or a mixture or substance containing 500 grams of methamphetamine, 5 kilograms or more of cocaine, and marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846, and conspiring to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), and 1956(h). Facing a possible life sentence, Amaya moved for a downward variance from his advisory guideline sentence based on what he characterizes as the prosecution's "double jeopardy violation" as well as the need to avoid unwarranted sentencing disparity among defendants. I concluded that a sentence within the advisory guideline sentence range was "greater than necessary" to accomplish the goals of sentencing, in light of all of the pertinent factors. *See* 18 U.S.C. § 3553(a). Accordingly, I granted Amaya's motion for a downward variance, albeit on different grounds than those raised by Amaya, based on my independent obligation to apply the § 3553(a) factors. I now enter this written explanation of my rationale for a sentence tailored to Amaya's circumstances in light of the applicable guidelines and 18 U.S.C. § 3553(a) factors. Unfortunately for Amaya, this still resulted in a sentence of 180 months.

## I. INTRODUCTION

### A. The Charges

In a two-count Superseding Indictment returned on July 28, 2011, defendant Angel Amaya and four co-defendants were charged with conspiracy to possess with intent to distribute 50 grams or more of pure methamphetamine or a mixture or substance containing 500 grams of methamphetamine, 5 kilograms or more of cocaine, and marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846, and with conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), and 1956(h).

### B. The Trials

The first attempt to try Amaya on the charges against him began on October 11, 2011.[1] However, I declared a mistrial that day, when the prosecution's first witness, a government agent, referred to material barred by a sealed ruling on a motion in limine.[2] The second attempt to try Amaya began on December 19, 2011, but it fared no better. I granted another mistrial on the first day, again during the testimony of the prosecution's first witness, the same government agent, when that witness disclosed for the first time the use of GPS devices to collect evidence in this case. I then entertained briefing on whether or not the second mistrial should result in dismissal with prejudice based on prosecutorial misconduct. On January 26, 2012, after considering the parties' briefs and hearing oral arguments, I concluded that the defendants had failed to meet the demanding standard for dismissal with prejudice after a mistrial.

The third attempt to try Amaya began on May 29, 2012. Although this trial proceeded past the first witness without a hitch, the jinx on the case continued, because the first day of the third trial did not pass without another motion for mistrial.

---

1. Amaya was tried with his brother and co-defendant, Javier Amaya.

2. The ruling on the motion in limine had not been provided to the agent prior to his testimony.

In this instance, during the redirect examination of witness Jorge Aguilar, the prosecution vouched for the witness by making an inadvertent declarative statement in response to the witness's testimony that he was telling the truth. Amaya made no objection or comment at the time of the prosecutor's statement nor after I brought the matter to the parties' attention. Notwithstanding the lack of a contemporaneous objection or comment, Amaya filed a Motion For Mistrial And/Or Curative Instruction after regular business hours on May 29, 2012. I took up Amaya's motion the following morning and, after hearing the parties' arguments, I gave a curative instruction to the jury. The trial continued without further incident on May 30, May 31, and June 1, 2012. Altogether, the prosecution called twenty witnesses. The prosecution rested on June 1, 2012, and Amaya rested immediately thereafter without calling any witnesses. Later that day, the jury returned a verdict in which it found Amaya guilty of all charged offenses.

Amaya subsequently filed a Motion For New Trial And Judgment Of Acquittal And/Or Renewed Motion For Mistrial. I heard oral arguments on Amaya's post-trial motions on August 2, 2012, and denied them in a lengthy memorandum opinion and order on August 10, 2012. *See United States v. Amaya,* No. CR11–4065–MWB, 2012 WL 3288082, at \*35 (N.D.Iowa Aug. 10, 2012).

### C. The Sentencing Hearing

On October 24, 2012, Amaya filed a Motion for Downward Variance and supporting brief. In his motion, Amaya argues that I should "consider the double jeopardy violation as a factor that would justify a variance down to 120 months." Defendant's Br. at 6. He argues that the prosecution has not been sanctioned for causing two mistrials while the resulting delays have subjected him to "embarrassment,

expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity for months." Defendant's Br. at 7. He also argues that the need to avoid unwarranted sentencing disparity among defendants supports a downward variance. On the same date, the prosecution filed a sentencing memorandum. The prosecution resisted Amaya's Motion for Downward Variance on October 26, 2012. On October 29, 2012, Amaya filed a response to the prosecution's sentencing memorandum. A sentencing hearing for Amaya began on October 30, 2012. The United States was represented by AUSA Timothy T. Duax of Sioux City, Iowa and Amaya was represented by R. Scott Rhinehart of the Rhinehart Law Firm, P.C., in Sioux City, Iowa. At the hearing, the prosecution presented documentary evidence and the testimony of two witnesses, Ana Cortes and Greg Fox. I heard oral arguments from the parties on Amaya's Motion for Downward Variance. Rather than imposing sentence that day, in order to permit myself time to give due consideration to my concerns regarding the appropriateness of a downward variance under the Sentencing Guidelines and to determine the appropriate sentence for Amaya, I completed the sentencing hearing on June 11, 2013. I now state the reasons for the sentence imposed on Amaya.

## II. LEGAL ANALYSIS

### A. Sentencing Methodology: Computing the Guideline Range; Departures; and Variances

Following the Supreme Court's decision in *Gall,* the Eighth Circuit Court of Appeals has repeatedly stated the methodology for determining a defendant's sentence as follows:

The district court should begin "by correctly calculating the applicable Guidelines range." "[T]he Guidelines should

be the starting point and the initial benchmark [, but] [t]he Guidelines are not the only consideration[.]" The district judge should allow "both parties an opportunity to argue for whatever sentence they deem appropriate," and then should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."

*United States v. Hill,* 552 F.3d 686, 691 (8th Cir.2009) (quoting *Gall v. United States,* 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)) (internal citations omitted); *United States v. Roberson,* 517 F.3d 990, 993 (8th Cir.2008); *see also United States v. Feemster,* 572 F.3d 455, 461–62 (8th Cir.2009) (*en banc* ).

The Supreme Court has recognized that a party's argument for a sentence outside the calculated guideline range may "take either of two forms." *Rita v. United States,* 551 U.S. 338, 344, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). A party may "argue *within the Guidelines' framework,* for a departure," *id.* (emphasis in original), or a party may "argue that, independent of the Guidelines, application of the factors set forth in 18 U.S.C. § 3553(a) warrants a [different] sentence." *Id.*[3] The Eighth Circuit Court of Appeals has made clear that, while "similar factors may justify either a variance or a traditional departure," *United States v. Woods,* 670 F.3d 883, 888 (8th Cir.2012), district courts are not limited by the Guidelines' departure policy framework when determining whether and by what extent to vary, *see United States v.*

*Chase,* 560 F.3d 828, 832 (8th Cir.2009); *United States v. VandeBrake,* 679 F.3d 1030, 1037 (8th Cir.2012); *see also United States v. Villareal–Amarillas,* 562 F.3d 892, 898 (8th Cir.2009) ("The judge is cabined, but also liberated, by the § 3553(a) factors.").[4]

As a matter of procedure, the Eighth Circuit Court of Appeals has instructed that district courts should "continue to engage in the three-step process of first ascertaining the applicable Guidelines range, then considering any permissible departures within the Guidelines' structure, and finally, deciding whether a non-Guidelines sentence would be more appropriate under the circumstances pursuant to § 3553(a)." *See United States v. Washington,* 515 F.3d 861, 866 (8th Cir.2008).

■ Although "a court of appeals may apply a presumption of reasonableness when conducting substantive review of a sentence within the advisory range, 'the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.'" *United States v. Henson,* 550 F.3d 739, 740 (8th Cir.2008) (quoting *Rita,* 551 U.S. at 351, 127 S.Ct. 2456). The Supreme Court has emphasized this point, noting "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," and that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States,* 555 U.S. 350, 129 S.Ct. 890, 892,

---

**3.** As the Eighth Circuit Court of Appeals has explained:

" 'Departure' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." *Irizarry v. United States,* 553 U.S. 708, 128 S.Ct. 2198, 171 L.Ed.2d 28 (2008). A variance, on the other hand, is a "non-Guidelines sentence[ ] based on the factors enumerated in 18

U.S.C. § 3553(a)." *United States v. Solis–Bermudez,* 501 F.3d 882, 884 (8th Cir.2007). *United States v. Mireles,* 617 F.3d 1009, 1012 n. 2 (8th Cir.2010).

**4.** *See Irizarry,* 553 U.S. at 714–15, 128 S.Ct. 2198 ("[T]here is no longer a limit comparable to [a departure] on the variances from Guidelines ranges that a district court may find justified under the sentencing factors set forth in 18 U.S.C. § 3553(a).").

172 L.Ed.2d 719 (2009) (*per curiam* ) (emphasis in the original).

As the Eighth Circuit Court of Appeals has also explained, "[w]e may not require " 'extraordinary' circumstances to justify a sentence outside the Guidelines." *Feemster*, 572 F.3d at 462 (quoting *Gall*, 552 U.S. at 47, 128 S.Ct. 586). Instead, the district court

> must "make an individualized assessment based on the facts presented." [*Gall*, 552 U.S. at 50, 128 S.Ct. 586.] If the court concludes that a sentence outside of the Guidelines range is warranted, then it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* "[A] major departure should be supported by a more significant justification than a minor one." *Id.* After the district court determines the "appropriate sentence," it must then "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.*

*Feemster*, 572 F.3d at 461.

First, I will determine the advisory guideline range for Amaya. Next, I will determine whether any traditional departures, either upward or downward, are warranted. Third, I will consider whether to vary from the advisory guideline range based on my independent obligation to apply the § 3553(a) factors.

### B. Step 1–Determining The Guideline Range

The first step in the sentencing process is to determine the proper guideline range for the defendant's sentence. *See United States v. Lozoya*, 623 F.3d 624, 625 (8th Cir.2010) ("In sentencing a defendant, a district court must first determine the advisory sentencing range as recommended

by the Guidelines."); *see also United States v. Mireles*, 617 F.3d 1009, 1012 (8th Cir.2010); *Roberson*, 517 F.3d at 993. In determining Amaya's advisory guideline range, I used the November 1, 2012, edition of the United States Sentencing Commission Guidelines Manual. *See Lozoya*, 623 F.3d at 625; *see also VandeBrake*, 679 F.3d at 1039 n. 7.

The Presentence Investigation Report ("PSR") set Amaya's base offense level at 36, pursuant to U.S.S.G. §§ 2D1.1 and 2S1.1, and recommended the following enhancements based on Amaya's relevant conduct: 1) a two-level enhancement, pursuant to U.S.S.G. § 2S1.1(b)(2)(B), for his § 1956 conviction; 2) a two-level enhancement, pursuant to U.S.S.G. § 3B1.4, for using a minor to commit the offense; 3) a three-level enhancement, pursuant to U.S.S.G. § 3B1.1(b), because Amaya was a manager or supervisor and the criminal activity involved five or more participants; and 4) a three-level enhancement, pursuant to U.S.S.G. § 3C1.1, because Amaya willfully obstructed or attempted to obstruct the investigation or prosecution of the charged offenses. Thus, the PSR set Amaya's adjusted offense level at 45. However, the PSR reset Amaya's total offense level as 43, because an "offense level of more than 43 is to be treated as an offense level of 43." U.S.S.G. Ch. 5, Pt. A, cmt. n.2; *see United States v. Okun*, 453 Fed.Appx. 364, 373 (4th Cir.2011) ("A total offense level of more than 43 is to be treated as an offense level of 43."); *United States v. Smith*, 437 Fed.Appx. 110, 112 n. 2 (3d Cir.2011) ("An offense level of more than 43 is treated as an offense level of 43 under the guidelines."). At this offense level, the United States Sentencing Guidelines recommends a life sentence.

Amaya has objected to these enhancements.[5] Thus, before I can calculate Amaya's proper guideline sentence I must re-

---

**5.** Amaya objected to the specific drug quantities attributed to him in the PSR. *See* PSR ¶¶ 8–9. However, he did not object to the

PSR's recommended base offense level of 36, which is based on the conclusion that the

solve his objections to those portions of the PSR which affect his guideline range.

### 1. Amaya's objections to the PSR

### a. Aggravating role in the offense

■ Amaya objects to the recommendation in the PSR that he receive a three level upward adjustment as a manager or supervisor in the money laundering offense, pursuant to U.S.S.G. § 3B1.1(b).[6] *See* PSR at ¶ 23. Specifically, Amaya argues:

Defendant Amaya did not manage or control Munoz, Forbes, Wenzel, Deanda, Cancino–Torres or Dwyer. Each of these individuals had their own drug operation. Sometimes they bought from Angel Amaya, sometimes they sold to Defendants. It was a question of who had what available drugs at the particular time. The Government fails to recognize that out of all the parties involved in this case, Eduardo Deanda was by far the biggest drug dealer with his own operation. Deanda wanted Defendant Amaya to partner with him on a drug deal. Defendant Amaya refused. Nevertheless, for some reason, the Government contends that his refusal constitutes a conspiracy or that the quantities that Deanda was pushing should somehow be attributable to Defendant Amaya.

Noris was a cocaine addict. Noris was never dealing with Defendant Amaya as he testified to at trial. The U.S. Attorney's "assumption" that Defendant Amaya was some kind of kingpin or major source of supply is in error. Defendant Amaya did not control any of the Government cooperators in this case

with the exception of Brendan Uhl and Octavio Noris. Defendant Amaya did use Brendan Uhl's address for their mutual benefit. To suggest that Defendant Amaya was a manager or supervisor of any of these folks is erroneous. This is true as it relates to the bank deposits as well. In this case, Defendant Amaya did provide deposited funds through Wells Fargo Bank. Defendant Amaya's roommate and now convicted felon, Luis Bernal, used the Bank of America for transferring funds as part of his operation. The Government's assumption that Defendant Amaya was regularly using Bank of America is mistaken. Defendant Amaya did coordinate drug transactions to control other people. For example, Shawn Forbes brought six ounces of cocaine to Defendant Amaya's house. Defendant Amaya took five ounces, Munoz took one ounce. Forbes also had several pounds of marijuana in his car. Defendant Amaya called Dan Wenzel over to buy the marijuana for Wenzel's own use. Defendant Amaya did send Octavio Noris down to Omaha with $35,000.00 however Noris mistakenly only took $30,000.00 down. Defendant Amaya did control Noris to a certain extent on this occasion.

Defendant's Objections To First Draft Of Presentence Investigation Report at ¶¶ 14–15 ("Defendant's Objections") (attached to PSR). The prosecution also objects to paragraph 23 of the PSR. However, the prosecution argues that Amaya should receive a four level upward adjustment because he should be considered an organizer or leader in the criminal activity, pursuant to U.S.S.G. § 3B1.1(a).

drug conspiracy involved 15,703.80 kilograms of marijuana equivalent. *See* PSR ¶ 19. Because I find that the charged drug conspiracy involved at least 10,000 kilograms, but less than 30,000 kilograms of marijuana equivalent, Amaya's objections to specific drug

quantities do not affect his base offense level and I need not resolve them.

6. The PSR did not recommend that Amaya receive an upward adjustment for his role in the drug conspiracy. See PSR at ¶ 23.

Under U.S.S.G. § 3B1.1(a), a court should increase a defendant's offense level by four levels if defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." If a defendant was a "manager or supervisor" of a criminal activity involving five or more participants or that was otherwise extensive, then a court should increase the defendant's offense level by three levels. U.S.S.G. § 3B1.1(b). If a defendant "was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." U.S.S.G. § 3B1.1(c). The terms "manager," "supervisor," "organizer," and "leader" are all broadly construed. *See United States v. Frausto*, 636 F.3d 992, 996 (8th Cir.2011) (" 'Each of these four terms is construed broadly.' ") (quoting *United States v. De Oliveira*, 623 F.3d 593, 599 (8th Cir.2010)); *see also United States v. Moreno*, 679 F.3d 1003, 1004 (8th Cir.2012) ("This court construes 'manager' and 'supervisor' broadly."); *United States v. Payton*, 636 F.3d 1027, 1048 (8th Cir.2011) (" 'We construe the terms 'manager' or 'supervisor' broadly . . .") (quoting *United States v. Bolden*, 622 F.3d 988, 990 (8th Cir.2010)); *United States v. Sarabia–Martinez*, 276 F.3d 447, 451 (8th Cir.2002) ("The terms 'organizer' and 'leader' are to be broadly interpreted.").

Under § 3B1.1, "[a] 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." [7] U.S.S.G. § 3B1.1 cmt. n.1. In distinguishing a lead-

ership and organizational role from one of management or supervision, courts are encouraged to consider:

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n. 4. In addition, the background to § 3B1.1 provides that:

In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of § 3B1.1(c).

*Id.* at cmt. background.

The prosecution must prove a § 3B1.1 enhancement by a preponderance of the evidence. *See Moreno*, 679 F.3d at 1004; *United States v. Rodriguez–Ramos*, 663 F.3d 356, 365 (8th Cir.2011); *United States v. Gaines*, 639 F.3d 423, 427 (8th Cir.2011); *Payton*, 636 F.3d at 1048; *United States v. Garcia–Hernandez*, 530 F.3d 657, 665 (8th Cir.2008). However, Amaya need only have directed one other participant to warrant an enhancement. *See Rodriguez–Ramos*, 663 F.3d at 365; *Payton*, 636 F.3d at 1048; *United States v. Johnson*, 619 F.3d 910, 921 (8th Cir.2010); *United States v.*

---

7. Customers do not typically qualify as participants for purposes of § 3B1.1. *See United States v. Egge*, 223 F.3d 1128, 1133 (9th Cir. 2000) ("[M]erely purchasing drugs from the seller, without more, does not qualify that customer as a participant for the purposes of the [§ 3B1.1] enhancement."); *United States v. Belletiere*, 971 F.2d, 961, 970 (3d Cir.1992)

("Before a . . . customer may be deemed to have been a 'controlled' participant under [§ 3B1.1], the government must prove at least an interdependence between the defendant and the . . . customer that would support an inference that the . . . customer for personal use is answerable to the defendant.").

*Mendoza,* 341 F.3d 687, 694 (8th Cir.2003); *United States v. Eis,* 322 F.3d 1023, 1025 (8th Cir.2003); *United States v. Sarabia–Martinez,* 276 F.3d 447, 451 (8th Cir.2002).

In his objections to the PSR, Amaya concedes that he sent Jorge Aguilar to Omaha with $35,000 and that he controlled Aguilar "to a certain extent on this occasion." [8] Defendant's Objections at ¶ 15. Aguilar testified at trial that Amaya summoned him to his home and, once there, told Aguilar that he needed Aguilar to take $35,000 to Omaha to pay somebody. Trial Tr. at 67. Aguilar also testified that Amaya had him make cash deposits in bank accounts that were not in either Amaya or Aguilar's name. Trial Tr. at 55. On another occasion, Aguilar opened a bank account at Amaya's request and then deposited money into the account given to him by Amaya. Trial Tr. at 56–57. Thus, at minimum, a two-level managerial role enhancement applies to Amaya. *See Johnson,* 619 F.3d at 921 (" 'For a two-level managerial role enhancement to apply, it is only necessary that the defendant supervise or manage one other participant.' ") (quoting *United States v. Parish,* 565 F.3d 528, 532 (8th Cir.2009)).

■ To qualify for either the four level enhancement as an organizer or leader under § 3B1.1(a), or the three level enhancement as a manager or supervisor under § 3B1.1(b), Amaya must be involved with a criminal activity "that involved five or more participants or was otherwise extensive." U.S.S.G.

§§ 3B1.1(a)-(b). A defendant may be included when determining whether there were five or more participants in the criminal activity. *See United States v. Harry,* 960 F.2d 51, 53 (8th Cir.1992); *United States v. Blandino,* 954 F.2d 1436, 1437 n. 2 (8th Cir.1992); *see also United States v. Lopez,* 392 Fed.Appx. 245, 256 (5th Cir.2010); *United States v. Ware,* 577 F.3d 442, 451 (2nd Cir.2009); *United States v. Egge,* 223 F.3d 1128, 1134 (9th Cir.2000); *United States v. Paccione,* 202 F.3d 622, 625 (2d Cir.2000); *United States v. Hardwell,* 80 F.3d 1471, 1496 (10th Cir. 1996); *United States v. Holland,* 22 F.3d 1040, 1045 (11th Cir.1994); *United States v. Fells,* 920 F.2d 1179, 1182 (4th Cir. 1990); *United States v. Barbontin,* 907 F.2d 1494, 1498 (5th Cir.1990); *United States v. Preakos,* 907 F.2d 7, 10 (1st Cir. 1990). In arguing that a four level enhancement is appropriate, the prosecution contends that Jorge Aguilar, Rafael Munoz, Shawn Forbes, Luis Deanda, Gilberto Apolonio, Didier Cancino–Torres, Brandon Uhl, Dan Wenzel, and Octavio Noris were all participants in Amaya's drug and money laundering conspiracies. Prosecution Sentencing Mem. at 8. The flaw in the prosecution's argument is that Amaya is charged with participating in two separate conspiracies, a drug conspiracy and a money laundering conspiracy, and these individuals were not necessarily participants in both. Of the individuals identified by the prosecution, only two qualify as participants in the money laundering conspiracy, Aguilar and Noris.[9] In addi-

---

8. In his objection, Amaya incorrectly identified Octavio Noris as the individual he sent to Omaha. At his sentencing hearing, Amaya admitted that he had misidentified the currency courier as Noris when in fact it was Aguilar.

9. I find that the prosecution has not established that Apolonio was a participant in either conspiracy. Apolonio did not testify at trial. So, unlike the other individuals identi-

fied as participants by the prosecution, there is no admission by Apolonio of his involvement in either conspiracy. In addition, there were less than a dozen fleeting references to him during the entire trial. Moreover, Apolonio was acquitted of drug charges in state court. The prosecution did introduce two banking documents, a bank deposit slip and a withdrawal slip, in Apolonio's name. Prosecution Exs. 19e and 20c. Both, however, are problematic. Christy Menke, a bank service

tion, for the purposes of Angel Amaya's sentencing only, I find that the prosecution has established by a preponderance of the evidence that Javier Amaya was a participant in the money laundering conspiracy. Thus, counting Amaya, I find that there were only four participants in the money laundering conspiracy and not the requisite five. Amaya, therefore, does not qualify for either a three or four level upward adjustment for his involvement in the money laundering conspiracy.

■ The prosecution has proven the required five or more participants in the drug conspiracy, but has not established that Amaya was an organizer, leader, manager, or supervisor in this criminal activity. Amaya argues that he was merely a buyer and/or seller of drugs but that he did not control any participants in his drug activities. He contends that these actions are insufficient to qualify as a leader, manager, organizer, or supervisor. I agree. Federal courts of appeals have held that "being a buyer and seller of illegal drugs, even in league with more than five or more other persons, does not establish that a defendant has functioned as an 'organizer, leader, manager or supervisor' of criminal activity." *United States v. Sayles,* 296 F.3d 219, 225 (4th Cir.2002); *see also United States v. Slade,* 631 F.3d 185, 190 (4th Cir.2011) (same, quoting *Sayles,* 296 F.3d at 225); *United States v. Betancourt,* 422 F.3d 240, 245 (5th Cir.2005) (accepting "the proposition from *Sayles*" that the prosecution must show more than that defendant was a buyer and seller of illegal drugs to qualify as an organizer, leader, manager, or supervisor); *United States v. Schuh,* 289 F.3d 968, 973 (7th Cir.2002) (holding that defendant's actions as a middleman for drug transaction was insufficient for a § 3B1.1 adjustment); *United States v. Graham,* 162 F.3d 1180, 1183–84 (D.C.Cir.1998) (holding that "the mere act of directing buyers to sellers does not constitute management or supervision warranting an enhancement."); *United States v. Glinton,* 154 F.3d 1245, 1260 (11th Cir. 1998) (holding that "[a] mere buyer/seller relationship is not a sufficient basis to

manager, testified that anybody could deposit money into anybody else's account. Trial Tr. at 106. Thus, the deposit slip, standing alone, does not establish that Apolonio actually made the deposit represented in it. Regarding the withdrawal slip, Aguilar testified that Apolonio went with him and Amaya to California, and, while there, Apolonio made a bank withdrawal. Trial Tr. at 62–63. However, Aguilar testified that he was not present when the withdrawal was made. Trial Tr. at 105. Thus, the circumstances of the withdrawal are entirely unknown. On this limited record, the prosecution has not established that Apolonio was a participant in the money laundering conspiracy. Evidence of Apolonio's involvement with the drug conspiracy is equally unconvincing. The only evidence presented at trial of Apolonio's involvement in the drug conspiracy was the following testimony by Deanda:

Q. Did you have any other drug transactions with Angel Amaya?

A. We did one. We didn't make any profit, so then we couldn't do any more. Oh. I did bring drugs to another guy. His name is Gilberto Apolonio.

Q. Based on your conversations with either Angel Amaya or Gilberto Apolonio, do you know if those two were also involved in drug trafficking together?

A. Yes.

Q. How do you know that?

A. Because some of those six ounces that I brought were flushed through the toilet and they were not paid for and Angel Amaya told me that Gilberto was the one that flushed them through the toilet.

Trial Tr. at 433–34. From this record, the circumstances of Deanda's delivery of drugs to Apolonio are entirely unknown. I am left to speculate about how Deanda came to deliver drugs to Apolonio, and whether the drugs were for Apolonio's personal use or resale. The paucity of information regarding Apolonio's involvement with drugs is insufficient for me to find that he was a participant in the charged drug conspiracy.

assess a managerial enhancement."); *United States v. Belletiere*, 971 F.2d 961, 970 (3d Cir.1992) (observing that "[w]here an individual is convicted of a series of solitary, non-related crimes, such as a series of drug sales by one drug seller to various buyers, and there is no 'organization' or 'scheme' between the drug seller and buyers, or between the buyers themselves, that the defendant could be said to have 'led' or 'organized,' section 3B1.1 cannot apply.").

Thus, I conclude that the prosecution has not proven by a preponderance of the evidence that a three or four level adjustment is warranted for Amaya's role in the drug conspiracy. However, for the reasons discussed above, I conclude that a two-level managerial role enhancement applies to Amaya for his role in the money laundering conspiracy. Amaya's objection to this portion of the PSR is sustained in part and denied in part.

### b. Using a minor

▇▇ Amaya also objects to the PSR's recommendation that he receive a two-level increase under U.S.S.G. § 3B1.4 for using or attempting to use a minor, Apolonio, to commit the money laundering offense. *See* PSR at ¶ 22. Section 3B1.4 states: "If the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase by 2 levels." U.S.S.G. § 3B1.4. Application Note 1 states: " 'Used or attempted to use' includes directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." U.S.S.G. § 3B1.4, cmt. n. 1. For this enhancement to apply, "the defendant must affirmatively involve or incorporate the minor into the commission of the offense[.]" *United States v. Mentzos*, 462 F.3d 830, 841 (8th Cir.2006) (citing *United States. v. Paine*, 407 F.3d 958, 965 (8th Cir.2005)). " 'Used

or attempted to use' does not [. . .] require active involvement on behalf of the minor." *Paine*, 407 F.3d at 965; *see United States v. Castro–Hernandez*, 258 F.3d 1057, 1060 (9th Cir.2001) ("It is sufficient that the defendant took affirmative steps to involve the minor in a manner that furthered or was intended to further the commission of the offense."). " 'The unambiguous legislative design of [§ ] 3B1.4 is to protect minors as a class from being "solicited, procured, recruited, counseled, encouraged, trained, directed, commanded, intimidated, or otherwise used" to commit crime.' " *Paine*, 407 F.3d at 965 (quoting *United States v. McClain*, 252 F.3d 1279, 1286 (11th Cir.2001)). "Among other things, a defendant may 'use' a minor by asking the minor to accompany him or her to a crime." *United States v. Voegtlin*, 437 F.3d 741, 747 (8th Cir.2006); *see also Paine*, 407 F.3d at 965 (holding that "asking [the defendant's] son to accompany him on the robbery because he would not otherwise have had the courage to commit the crime" is sufficient "use" of a minor to apply § 3B1.4).

Amaya brought Apolonio along on the trip to California, paying for Apolonio's plane tickets. During this trip, Amaya had funds withdrawn from a bank account in Apolonio's name to make a payment on a drug debt. I conclude from these actions that Amaya brought Apolonio along on the trip, at minimum, to assist in avoiding the detection of his money laundering activities. Accordingly, I find that there is sufficient evidence in the record for me to reasonably find that Amaya used a minor to avoid detection of the money laundering offense and the two-level increase under § 3B1.4 is appropriate. Amaya's objection to this portion of the PSR is denied.

### c. Obstruction of justice

▇▇ Amaya also objects to the PSR's recommendation that he receive a two-

level increase for obstruction of justice under U.S.S.G. § 3C1.1. *See* PSR at ¶ 15. This recommendation is based on Amaya's posting of the "Government's Amended Witness List," which he labeled a "snitch list," on his internet Facebook page, and a response Amaya made to a comment on Facebook after the list was posted.[10] *See* Prosecution Ex. 5. Amaya contends that his posting of the witness list was not done to intimidate any witness and points out that the witness list was not sealed. He argues that he was compelled to post the list to refute rumors in the community that he was cooperating with law enforcement, and to prove that he was taking his case to trial. Defendant's Objections at 4.

The prosecution argues that Amaya's true intention in posting the witness list is demonstrated by the fact that Amaya labeled it a "snitch list" and he could have accomplished his stated goal, refuting rumors of his cooperation, without posting the list. The prosecution also points to Amaya's response to a comment on Facebook as evidencing Amaya's intention when he posted the witness list. After Amaya posted the witness list, a third party commented "fucken tavo thats [sic] fucked up homie". Prosecution Ex. 5. Tavo is Octavio Noris's nickname. In response, Amaya wrote: "what can i [sic] say rats are rats". Prosecution Ex. 5.

The prosecution also argues that an obstruction of justice enhancement is warranted because, while on house arrest prior to trial, Amaya had a third party make contact with witness Ana Cortes's husband, and request that he visit Amaya's home. When Cortes's husband did so, Amaya told him that if Cortes testified at Amaya's trial, Amaya wasn't going to go down alone and that he would take everyone with him, including Cortes. Amaya

responds that he and Cortes's husband were long-time friends and that he was merely venting during the course of a conversation with his friend. Amaya argues that his comment was not meant to scare or intimidate Cortes.

Section 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.

Section 3C1.1 requires "willful" obstruction of justice. *See United States v. Petrovic,* 701 F.3d 849, 859 (8th Cir.2012); *United States v. Boesen,* 541 F.3d 838, 851 (8th Cir.2008); *United States v. Whiting,* 522 F.3d 845, 850 (8th Cir.2008). However, "some conduct simply *is* obstruction of justice regardless of the effects the actor intended or expected. *United States v. Wahlstrom,* 588 F.3d 538, 545 (8th Cir. 2009) (emphasis original) (citing *United States v. Cassiliano,* 137 F.3d 742, 747 (2d Cir.1998)). For example, "[a]ttempting to harm a prosecutor's family member is 'so inherently obstructive of the administration of justice that the enhancement should be applied if the defendant deliberately engaged in that conduct, regardless of [his or] her specific purpose.'" *Wahlstrom,* 588 F.3d at 545 (quoting *Cassiliano,* 137 F.3d at 747) (internal quotation marks omitted).

---

**10.** "A snitch is a negative slang term offenders use to describe an informant." *United States v. Galaviz,* 687 F.3d 1042, 1044 n. 1 (8th Cir.2012) (Smith, J., dissenting) (citing *White v. Fox,* 470 Fed.Appx. 214, 220–21 (5th Cir.2012)).

■ " 'A district court must find the predicate facts supporting such an enhancement for obstruction of justice by a preponderance of the evidence.' " *United States v. Walker,* 688 F.3d 416, 425 (8th Cir.2012) (quoting *United States v. Alvarado,* 615 F.3d 916, 922 (8th Cir.2010); *see Petrovic,* 701 F.3d at 859; *Boesen,* 541 F.3d at 851; *United States v. Tyndall,* 521 F.3d 877, 882 (8th Cir.2008). The Eighth Circuit Court of Appeals has instructed that, "[a]n attempt to intimidate or threaten a witness, even if unsuccessful, is sufficient to sustain a two-level enhancement for obstruction of justice." *United States v. Carrillo,* 380 F.3d 411, 415 (8th Cir. 2004) (quotations and citations omitted); *see United States v. Vickers,* 528 F.3d 1116, 1121 (8th Cir.2008) (holding that defendant's attempt "to induce witnesses to change their stories through threats and offers of payment" supported obstruction of justice enhancement); *United States v. Carrillo,* 380 F.3d 411, 414 (8th Cir.2004) (" 'An attempt to intimidate or threaten a witness, even if unsuccessful, is sufficient to sustain a two-level enhancement for obstruction of justice.' ") (quoting *United States v. Vaca,* 289 F.3d 1046, 1049 (8th Cir.2002) (quoting in turn *United States v. Thompson,* 210 F.3d 855, 861 (8th Cir. 2000) (quotation marks omitted)); *United States v. Davis,* 357 F.3d 726, 729 (8th Cir.2004) (holding two-level adjustment warranted for threatening witnesses, as such threats were "calculated to impede a criminal investigation and therefore constituted an obstruction of justice"), *rev'd on other grounds,* 543 U.S. 1099, 125 S.Ct. 1049, 160 L.Ed.2d 993 (2005). Moreover, "[t]he language of § 3C1.1 is broad, and as the commentary recognizes, '[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness.' " *Wahlstrom,* 588 F.3d at 544 (quoting U.S.S.G. § 3C1.1 cmt. n.3). The commentary to the guideline provides a nonexhaustive list of the types of conduct to which the adjustment applies, including "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 cmt. n. 4(a).

■ The possible obstruction of justice enhancement, for Amaya posting the prosecution's witness list, raises the issue of whether such conduct is protected by the First Amendment. The First Amendment provides "Congress shall make no law ... abridging the freedom of speech." U.S. CONST. amend. I. " '[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.' " *United States v. Alvarez,* —— U.S. ——, 132 S.Ct. 2537,. 2543, 183 L.Ed.2d 574 (2012) (quoting *Ashcroft v. American Civil Liberties Union,* 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002)). "There is 'no First Amendment right to make intimidating threats against government witnesses.' " *United States v. Judd,* 315 Fed.Appx. 35, 39 (10th Cir.2008) (quoting *United States v. Jackson,* 974 F.2d 104, 106 (9th Cir.1992) (citing in turn *United States v. Shoulberg,* 895 F.2d 882, 886 (2d Cir.1990)). This is because "true threats" are not protected by the First Amendment. *See Virginia v. Black,* 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003); *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969); *D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60,* 647 F.3d 754, 764 (8th Cir.2011); *Riehm v. Engelking,* 538 F.3d 952, 963 (8th Cir.2008); *see also United States v. Koschuk,* 480 Fed.Appx. 616, 617 (2nd Cir.2012), *cert. denied,* —— U.S. ——, 133 S.Ct. 902, 184 L.Ed.2d 699 (2013); *United States v. White,* 670 F.3d 498, 526 (4th Cir.2012); *United States v. Stewart,* 420 F.3d 1007, 1016 (9th Cir. 2005); *United States v. Nishnianidze,* 342 F.3d 6, 16 (1st Cir.2003); *United States v.*

*Landham,* 251 F.3d 1072, 1080 (6th Cir. 2001). "True threats" constitute one of the "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *see Alvarez,* 132 S.Ct. at 2544 (recognizing that true threats are one of the few· " 'historic and traditional categories [of expression]' " in which content-based restrictions on speech is permitted); *United States v. Williams,* 690 F.3d 1056, 1061 (8th Cir.2012)· (noting that true threats are one of the "discrete categories of content-based restrictions on speech" permitted under the First Amendment).

■ " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an· act ·of unlawful violence to a particular individual or group of individuals." *Black,* 538 U.S. at 359, 123 S.Ct. 1536; *see United States v. Mabie,* 663 F.3d 322, 330 (8th Cir.2011) ("A 'true threat' is defined as a 'statement that a reasonable recipient would have interpreted as a serious expression of an intent· to harm or cause injury to another.' " (quoting *Doe v. Pulaski Cnty. Special Sch. Dist.,* 306 F.3d 616, 624 (8th Cir.2002) (*en banc* )). The "prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Id.* at 360, 123 S.Ct. 1536 (internal quotations omitted). A "true threat" is "determined. from the point of view of a reasonable recipient." *Williams,* 690 F.3d at 1062; *see Mabie,* 663 F.3d at 330–31; *United States v. Beale,* 620 F.3d 856, 865 (8th Cir.2010); *Doe,* 306 F.3d at 624.

The "true threat" doctrine originated in *Watts,* where the petitioner appealed his conviction for violating 18 U.S.C. § 871, which prohibits any person from "knowingly and willfully ... [making] any threat to take the life of or to inflict bodily harm upon the President of the United States." *Watts,* 394 U.S. at 705–05, 89 S.Ct. 1399. The petitioner's conviction was based on the following statement made by Watts, during an anti-Vietnam War rally: "They always holler at us to get an education. And now I have already received my draft classification as 1–A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706, 89 S.Ct. 1399. The Supreme Court reversed, concluding that the petitioner's speech was not a "true threat." After recognizing the nation's valid, "even overwhelming," interest in the President's life, the Court observed:

> Nevertheless, a statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech.

*Id.* at 707, 89 S.Ct. 1399. The Court went on to hold that, " 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials,' " *id.* at 708, 89 S.Ct. 1399 (citation omitted), the petitioner's speech did not rise to the level of "true threat" and was thus protected by the First Amendment. *Id.*

■ The terms "snitch" and "rat," as used by Amaya to describe prosecution witnesses, generally carries a negative connotation. The following first sentence

of a law review article succinctly summarizes the connotation of these words:

> "To mobsters, he is a 'rat'; to drug dealers, a 'snitch.' To school children, he is a 'tattletale'; to corporate executives, a 'whistle-blower.' To cops, he is an 'informant'; to prosecutors, a 'cooperator.' By whatever name he is known, the person who betrays his associates to the authorities is almost universally reviled. In movies, on television, in literature, the cooperator embodies all that society holds in contempt: he is disloyal, deceitful, greedy, selfish, and weak."

Michael A. Simons, *Retribution for Rats: Cooperation, Punishment, and Atonement*, 56 Vand. L. Rev. 1, 2 (2003). The First Amendment, however, does not prohibit name-calling. *See Wright v. South Ark. Reg'l Health Ctr., Inc.*, 800 F.2d 199, 204 (8th Cir.1986). The First Amendment protects "vehement, caustic, and sometimes unpleasantly sharp attacks" as well as language that is "vituperative, abusive, and inexact." *Watts*, 394 U.S. at 708, 89 S.Ct. 1399. Further, the First Amendment protects such speech even though "it may embarrass others or coerce them into action." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). Thus, "threats of vilification or social ostracism" are protected by the First Amendment. *Id.* It is only when speech crosses the line separating insults from "true threats" that it loses its First Amendment protection. Amaya's posting of the prosecution's witness list does not cross that line.

I find that Amaya never intended to, directly or indirectly, intimidate or influence any witness by this posting. I base my conclusion on several facts. The posting contains no explicit or implicit threats to any of the witnesses. Other than Amaya's "snitch list" editorialization, the posting contains no pejorative comments about the witnesses. Rather, the posting is otherwise factually accurate, providing an unedited list of the prosecution's witnesses against Amaya. Significantly, Amaya did not tell any witness about the posting or otherwise direct their attention to it. Amaya's conduct, in merely posting the witness list, pales in comparison to the conduct courts have found sufficient to warrant a sentence enhancement for obstruction of justice. *See United States v. Lindsey*, 123 F.3d 978 (7th Cir.1997) (holding two level increase for obstruction of justice appropriate where defendant distributed a "wanted" poster containing a picture of witness and defendant's offer of money to any who would beat up the witness); *see also United States v. Little*, 472 Fed.Appx. 129, 132 (3rd Cir.2012) (holding defendant's conduct in writing letter to the mother of one of his coconspirator's children in which he "implicitly threatened the co-conspirator with harm, warning that 'snitches die slow'" supported a two level increase for obstruction of justice); *United States v. Jackson*, 974 F.2d 104, 105 (9th Cir.1992) (holding two level increase for obstruction of justice appropriate where defendant wrote "The 'Rat' Fred Pittman" and "Snitch" on witness's cooperation agreement, gave copies of the cooperation agreement to others, and circulated copies of it at a restaurant and nightclub, intending his actions would "[chill] potential witnesses' willingness to cooperate with the government ...."). Thus, I find the posting of the witness list was not a "true threat," as such, it is protected by the First Amendment, and does not warrant an obstruction of justice enhancement.

I note that Amaya had every right to investigate the prosecution's witnesses and to seek witnesses or information he could use on his own behalf at trial. The prosecution has a virtually unlimited budget with which to investigate and prosecute its cases. In comparison, most defendants have very limited resources at their disposal. Private investigators are largely

unavailable, and, even when available, the resources available to the typical defendant do not compare to those the prosecution can bring to bear. A social media website such as Facebook offers a defendant an affordable, easy, and extremely viable option to seek information to employ in his or her defense. The posting by Amaya of the witness list was just such a use.

I similarly conclude that Amaya never intended to intimidate or influence Ana Cortes by his comment to her husband. The situation here is similar to *United States v. Hernandez,* 83 F.3d 582, 585–86 (2d Cir.1996). In *Hernandez,* the defendant spoke to to a cooperating witness before trial, calling her "the devil," and said she would "stare [the witness] down" at trial. *Id.* at 585. The Second Circuit Court of Appeals held the district court's finding of obstructive intent clearly erroneous, even though the witness was "scared." *Id.* The court of appeals found the statement was not a threat but was merely an expression of a feeling of betrayal, observing that "[f]'ury may be exceedingly unpleasant, but alone, it bespeaks no intent to obstruct justice." *Id.* at 586. Like the defendant in *Hernandez,* I find that Amaya's statement to Cortes's husband was merely his frustrated venting about the circumstances in which he found himself and was not made with any intent to obstruct justice. I recognize that "[a] defendant can attempt to influence a witness indirectly by asking a third party to threaten or communicate with the witness." *United States v. Fleming,* 667 F.3d 1098, 1109–10 (10th Cir.2011). Here, however, Amaya never asked Cortes's husband to relay his message to Cortes. Indeed, Amaya never asked Cortes's husband to relay any information or statement to her. Moreover, Amaya's reference "to taking everybody with him", could not have been threatening to Cortes since she was already a witness for the prosecution. Thus,

I am unpersuaded that Amaya had the requisite intent to obstruct justice when he made his statement to Cortes's husband and will not impose an obstruction of justice enhancement under § 3C1.1. Amaya's objection to this portion of the PSR is sustained.

#### d. Acceptance of responsibility

██ Amaya also objects to the PSR's recommendation that he not receive a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. *See* PSR at ¶ 16. Amaya argues that he went through with the third trial in order to preserve his claim that the Fifth Amendment's double jeopardy clause barred his retrial because the prosecutor's conduct was intended to 'goad' him into moving for a mistrial. *See Oregon v. Kennedy,* 456 U.S. 667, 673, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *Garrison v. Burt,* 637 F.3d 849, 853 (8th Cir. 2011). In response, the prosecution argues that Amaya does not qualify for acceptance of responsibility because he has put the prosecution to its burden of proof at trial, and expressed remorse for his actions only after being convicted. The prosecution also argues that Amaya does not qualify for acceptance of responsibility because he has obstructed justice.

Section 3E1.1(a) permits a sentencing court to reduce a defendant's offense level by two "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." Amaya bears the burden of demonstrating that he is entitled to a reduction for his acceptance of responsibility. *See United States v. Daniels,* 625 F.3d 529, 534 (8th Cir.2010); *United States v. Wallenfang,* 568 F.3d 649, 661 (8th Cir.2009); *United States v. Herron,* 539 F.3d 881, 887–88 (8th Cir.2008). " 'Whether the defendant accepted responsibility is a factual question that depends largely on credibility assessments made by the sentencing court.' " *United States v. Ayala,* 610 F.3d

1035, 1036 (8th Cir.2010) (quoting *United States v. Long Soldier*, 431 F.3d 1120, 1122–23 (8th Cir.2005)).

The prosecution contends that Amaya's obstruction of justice precludes him from receiving a reduction for acceptance of responsibility. The Eighth Circuit Court of Appeals has held that a defendant guilty of obstructing justice may only receive a downward adjustment for acceptance of responsibility in "extraordinary case[s]." *United States v. Honken*, 184 F.3d 961, 967 (8th Cir.1999); *see United States v. Walker*, 688 F.3d 416, 426 (8th Cir.2012); *United States v. Godsey*, 690 F.3d 906, 911 (8th Cir.2012); *United States v. Jones*, 612 F.3d 1040, 1047 (8th Cir.2010). However, I have found that Amaya did not obstruct justice. Therefore, this line of authorities does not bar Amaya from receiving a reduction for acceptance of responsibility.

Amaya elected to proceed to trial. The commentary accompanying § 3E1.1 explains that:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of

a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

U.S.S.G. § 3E1.1 cmt. n. 2.

Amaya argues that this is the "rare situation" where he is entitled to a reduction for acceptance of responsibility in spite of the fact that he proceeded to trial and put the prosecution to its proof. Amaya argues that he had to go to trial to preserve his double jeopardy argument for appeal. This argument fails for two reasons. First, this argument does not explain why he went to trial initially. Second, Amaya had an alternative means to preserving his double jeopardy argument which did not require him to go to trial. He possibly could have entered a conditional guilty plea, pursuant to Federal Rule of Criminal Procedure 11(a)(2), reserving the right to raise his double jeopardy claim on appeal.[11] Amaya never attempted to do so, and has not demonstrated that he was precluded from doing so. Under these circumstances, Amaya has not proven he is entitled to an acceptance of responsibility reduction. *See United States v. Cordero*, 465 F.3d 626, 632 (5th Cir.2006) (affirming denial of acceptance of responsibility where defendant failed to show that he could not have entered a conditional guilty plea to preserve for appeal issues raised in his pretrial motions). Amaya's objection to this portion of the PSR is denied.

### 2. *Offense level computation*

I find that the charged drug conspiracy involved at least 10,000 kilograms but less than 30,000 kilograms of marijuana equiva-

---

**11.** Rule 11(a)(2) provides that: "With the consent of the court and the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion. A defendant who prevails on appeal may then withdraw the plea."

lent. Thus, I find, pursuant to U.S.S.G. § 2D1.1, that Amaya's base offense level is 36.[12] I next examine the potential offense level adjustments and enhancements. I find that, pursuant to U.S.S.G. § 2S1.1(b)(2)(B), Amaya qualifies for a two point enhancement because of his money laundering conviction. I also find that, pursuant to U.S.S.G. § 3B1.4, Amaya qualifies for a two point enhancement for using a minor to commit the offense. I further find that, pursuant to U.S.S.G. § 3B1.1(c), Amaya qualifies for a two point enhancement because he was an organizer, leader, manager, or supervisor of the money laundering conspiracy. Thus, Amaya's adjusted offense level is 42. The parties agree, and I find, that Amaya's criminal history category is I, with one criminal history point for a state conviction for driving while barred. Amaya's advisory guideline sentence is 360 months to life.

### C. Step 2—Determination Of Whether To Depart

In the second step of the sentencing methodology, I determine whether any traditional "departure" is appropriate, see *United States v. Washington,* 515 F.3d 861, 866 (8th Cir.2008), that is, whether there are features of Amaya's case that potentially take it outside the Guidelines "heartland" and make it a special or unusual case warranting a departure, see *United States v. Chase,* 451 F.3d 474, 482 (8th Cir.2006); U.S.S.G. § 5K2.0; *id.* § 1A1.1, cmt. (n.4(b)).

The prosecution has not sought an upward departure, and Amaya has not sought a downward departure. I do not believe that there are any sound bases for either a traditional upward or downward departure, that is, that there are features

of Amaya's case that potentially take it outside the Guidelines "heartland" and make it a special or unusual case warranting a departure provided for in Chapter Five or § 4A1.3 of the Guidelines. Therefore, I find no departures are warranted.

### D. Step 3—Application Of The § 3553(a) Factors

### 1. Overview of § 3553(a) factors

■ The third step in the sentencing methodology requires that I apply the § 3553(a) factors to determine whether to impose a guideline or non-guideline sentence. The prosecution argues that application of the § 3553(a) factors does not warrant a downward variance for Amaya. I disagree. Section 3553(a) lists the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for—(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ... (5) any pertinent policy statement ... issued by the Sentencing Commission ...; (6) the need to avoid unwarranted sentence dis-

---

**12.** The guideline for money laundering offenses, U.S.S.G. § 2S1.1, directs using the offense level for the underlying offense from which the laundered funds were derived. In this case, the underlying drug offense is the drug conspiracy, which pursuant to U.S.S.G. § 2D1.1, establishes an offense level of 36 based on 10,000 kilograms to 30,000 kilograms of marijuana equivalent.

parities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7) (line breaks omitted).

The Eighth Circuit Court of Appeals has held "[t]he district court has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. Bridges,* 569 F.3d 374, 379 (8th Cir. 2009); *see United States v. Chaika,* 695 F.3d 741, 746 (8th Cir.2012). In considering the § 3553(a) factors, "[a] district court is not required to recite each of the sentencing factors under 18 U.S.C. § 3553(a), as long as the record makes clear that they were considered." *United States v. Powills,* 537 F.3d 947, 950 (8th Cir.2008); *see United States v. Gasaway,* 684 F.3d 804, 807–08 (8th Cir.2012) (" 'The district court is presumed to know the law in regard to sentencing and need not recite each factor to be upheld. When we review the § 3553(a) factors, we will look to the entire record.' ") (quoting *United States v. Keating,* 579 F.3d 891, 893 (8th Cir.2009) (internal citation omitted)). Nevertheless, I will expressly consider each of the § 3553(a) factors in turn.

### 2. *Nature and circumstances of the offense*

The first § 3553(a) factor requires me to consider the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). As Amaya readily admits in his brief, he was a "drug dealer." Defendant's Br. at 9. At trial, the prosecution presented the testimony of twenty witnesses. Brendan Uhl, Dan Wenzel, Shawn Forbes, Rafael Munoz, Scott Dwyer, Didier Cancino–Torres, Luis Eduardo Deanda, Octavio Noris, and Jorge Aguilar all testified to their personal involvement with Amaya in various aspects of his drug trafficking activities. The testimony of these cooperators was corroborated by circumstantial evidence of phone records; drug pay/owe sheets; a recorded conversation between co-conspirator Deanda and Amaya discussing a contemplated drug transaction; evidence of transfers of funds in payment for drugs; and the interception of a shipment of marijuana.

On February 15, 2011, Didier Cancino–Torres was arrested following a controlled drug buy in which he was the source of the methamphetamine involved in the transaction. On March 2, 2011, Cancino–Torres participated in a proffer with law enforcement officers. During this proffer, Cancino–Torres identified "Angel" as his source of methamphetamine. Cancino–Torres later identified Amaya as being "Angel." Cancino–Torres testified at trial to receiving a total of approximately three kilograms of methamphetamine from Amaya. "Pay/owe" sheets recovered from Amaya's trash, and introduced as evidence at his trial, indicated that Cancino–Torres owed Amaya $48,000. Amaya's price to Cancino–Torres for one pound of methamphetamine was $23,000.

Shawn Forbes delivered six ounces of cocaine to Amaya. Amaya also obtained methamphetamine and marijuana from Forbes. Rafael Munoz bought cocaine from cocaine from Amaya and, at one point, saw Amaya with a kilo of cocaine. Jorge Aguilar bought marijuana from Amaya. Scott Dwyer purchased methamphetamine from Amaya several times, buying two to four ounces each time. Dan Wenzel bought marijuana and cocaine from Amaya. He estimates that he bought between forty and six pounds of marijuana from Amaya. Amaya would front Wenzel the drugs and Wenzel would pay Amaya after he sold them. Brandon Uhl arranged drug sales between Amaya

and persons he knew were looking to purchase marijuana. Similarly, Luis Eduardo Deanda obtained drugs from Amaya and split the profits with Amaya after Deanda sold them.

The evidence at trial also established that Amaya arranged for the transportation of methamphetamine, cocaine, and marijuana from California and Texas to Iowa. Amaya would then distribute the drugs in the Sioux City area using a network of friends and associates. Amaya, through Joseph Meyer, asked Brandon Uhl to provide addresses for the drug deliveries. Uhl gave Amaya his own address, his "baby's mother's" address, and the address of an ex-roommate of his baby's mother. The third shipment, from California, was intercepted by law enforcement agents.

As a direct offshoot of his drug activities, Amaya also engaged in a conspiracy to launder his drug trafficking proceeds. As part of this money laundering conspiracy, Amaya either deposited or directed others to deposit drug proceeds into at least ten different bank accounts. Amaya provided the money, between $6,000 and $8,000, for the deposits. On at least two occasions, Amaya directed individuals to open a new account into which they would deposit drug proceeds. On one such occasion, Javier Amaya gave his personal information to a teller at a Wells Fargo branch bank in Sioux City, Iowa, to open an account and Amaya gave the teller the money to open the account. When the teller asked where the money came from, Amaya replied, "Don't ask, you don't want to know." Ann Cortes, in her position as a bank teller, deposited money for Amaya several times into bank accounts which were not in Amaya's name. Also in furtherance of his money laundering activities, Amaya, along with Javier Amaya, Jorge Aguilar, and Apolonio, traveled to California, at Amaya's expense. The group went the day after bank deposits were made in Sioux City. Then, while in California, Amaya and Aguilar withdrew money from one account at essentially the same time that Javier Amaya withdrew money from the Sioux City account he had opened.

Drug distribution and money laundering are undoubtedly serious crimes. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 42, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) ("There is no doubt that traffic in illegal narcotics creates social harms of the first magnitude."). Methamphetamine and cocaine are highly addictive, and drug transactions involving them are associated with gangs, guns, and violence. *See United States v. Bustos–Torres*, 396 F.3d 935, 943 (8th Cir.2005) (observing that "weapons and violence are frequently associated with drug transactions ..."). However, there are varying levels of participation and blameworthiness in any drug distribution scheme. Unlike the defendant in *United States v. Newhouse*, 919 F.Supp.2d 955, 957–59 (N.D.Iowa 2013), to whom I recently granted a substantial downward variance, Amaya is not a mere pill smurfer, a low-level, non-violent drug addict engaged in the drug trade to obtain drugs to feed an addiction. Amaya's role was several rungs up the ladder from the drug smurfer. While clearly occupying a position above a drug smurf, Amaya was by no means a drug kingpin. Rather, he was, at best, a mid-level distributor.

A substantially mitigating circumstance in this case is that there is not a shred of evidence indicating that Amaya's participation in these crimes involved any violence. Notably, while courts have recognized many times that guns are tools of the drug trade, *see United States v. Jordan*, 260 F.3d 930 (8th Cir.2001); *Lyons v. Robinson*, 783 F.2d 737, 739 (8th Cir.1985) *see also United States v. Fife*, 624 F.3d

441, 447 (7th Cir.2010); *United States v. Vaughn*, 585 F.3d 1024, 1029 (7th Cir. 2009); *United States v. Hardin*, 248 F.3d 489, 499 (6th Cir.2001); *United States v. McKissick*, 204 F.3d 1282, 1293 (10th Cir. 2000); *United States v. Ward*, 171 F.3d 188, 195 (4th Cir.1999); *United States v. Russell*, 134 F.3d 171, 183 (3d Cir.1998); *United States v. Westbrook*, 119 F.3d 1176, 1193 (5th Cir.1997); *United States v. Martinez*, 938 F.2d 1078, 1083–84 (10th Cir. 1991); *United States v. Martin*, 794 F.2d 1531, 1533 (11th Cir.1986), there is no evidence that Amaya ever possessed a gun, or any other weapon. Likewise, while gang membership has been found to be associated with violence in the drug trade, *see, e.g., United States v. Williams*, 81 F.3d 1434, 1437 (7th Cir.1996) (noting that El Rukn gang members "committed many murders, and engaged in much other violence, in the turf wars that are endemic to the trade in illegal drugs."), there is absolutely no evidence of any gang involvement by Amaya.

### 3. *Amaya's history and characteristics*

The first § 3553(a) factor also requires that I consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Amaya is 25 years old. He is one of five children. His parents moved to the United States 25 years ago and are legal residents. Amaya is a citizen of the United States. His parents reside in Sioux City, Iowa, and are employed. His father is also a pastor in a local church. Amaya's parents have no prior arrests or substance abuse history. Amaya has a good relationship with his parents. Amaya's four siblings all reside in Sioux City. Neither of his two adult siblings abuse drugs or alcohol.

Amaya graduated from high school in 2005. Since graduating, his employment history has been sporadic. He has largely worked in construction, but has also done "odd jobs" and sold items on Craigslist.

He has four misdemeanor convictions: driving with a revoked license and contributing to the delinquency of a minor, when he was 19; driving while barred, at age 20; and failing to have a valid driver's license, when he was 22.

Amaya began drinking alcohol when he was 15 years old. He has consumed alcohol daily since he was 20 years old. When he was 18 years old, Amaya began smoking marijuana and using cocaine. Since he was 22 years old, he used both marijuana and cocaine on a daily basis. Amaya has never tried methamphetamine. He has never been evaluated or treated for substance abuse. Amaya has no history of mental or emotional health concerns. There was no evidence at trial, and no indication in the PSR, that Amaya's criminal conduct resulted from drug addiction. I have no doubt that Amaya's own drug use was the conduit that led to his involvement in the drug trade. However, the advanced level of Amaya's drug trafficking was not done merely to feed an addiction but appears to be the result of greed or at least a preference for making "easy money" dealing drugs rather than by working hard.

### 4. *The need for the sentence imposed*

The second § 3553(a) factor is "the need for the sentence imposed," § 3553(a)(2), including the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct," § 3553(a)(2)(B), "to protect the public from further crimes of the defendant," § 3553(a)(2)(C), and "to provide the defendant with needed educational or vocational training" or other care or treatment, § 3553(a)(2)(D).

A 360 month sentence at the low end of Amaya's advisory guideline sentencing

range is far greater than any of the sentences given to Amaya's co-defendants. Indeed, it is over six times longer than the sentences given to Noris, Aguilar, and Deanda combined. Sentencing Amaya to such a disproportionate sentence, even when taking into account his greater role and culpability in the drug and money laundering conspiracies, would not promote respect for the law. Quite the opposite, disproportionate, unduly harsh sentences breed disrespect for the law. As the Supreme Court observed in *Gall:*

> a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.

*Gall,* 552 U.S. at 54, 128 S.Ct. 586 (quoting with approval the reasoning of the district court); *see also United States v. Deegan,* 605 F.3d 625, 655 (8th Cir.2010) (Bright, J., dissenting) (observing that harsh federal punishment when compared to lenient state sentencing for the same criminal activity "promotes disrespect for the law and the judicial system."); *United States v. Ontiveros,* 07–CR–333, 2008 WL 2937539, at *3 (E.D.Wis. July 24, 2008) ("[A] sentence that is disproportionately long in relation to the offense is unjust and likewise fails to promote respect [for the law].").  A 180 month sentence, while well below Amaya's advisory guideline range, is still an extremely lengthy sentence and still much greater than the sentences given to all of Amaya's co-defendants. Such a sentence, however, is not grossly disproportionate when Amaya's role and culpability are taken into account.

I further find that a 180 month sentence is sufficient in length to reflect the seriousness of the offense, promote respect for the law, provide just punishment, protect the public, and reflect the factors embodied in § 3553(a)(2). I also find that a sentence within Amaya's advisory guideline sentencing range of 360 months to life is greater than necessary to achieve the purposes set out in § 3553(a)(2).

I further note the great disparity between the 360 month sentence at the low end of Amaya's advisory guideline sentencing range and the sentences Amaya previously received. *See United States v. Qualls,* 373 F.Supp.2d 873, 877 (E.D.Wis. 2005) ("It is appropriate for a court, when considering the type of sentence necessary to protect the public and deter future misconduct, to note the length of any previous sentences imposed."); *see also United States v. Patzer,* 548 F.Supp.2d 612, 616–17 (N.D.Ill.2008) (considering the disparity between defendant's guideline sentence in current case and defendant's prior sentences in determining length of sentence required for deterrence and observing that "[c]ourts have noted that a large disparity between the punishment prescribed by the career criminal designation and the time served for prior offenses might indicate that the career criminal sentence is in excess of that needed to accomplish the desired deterrent effect). The longest, and only, period of incarceration Amaya has previously served is one day on a 60 day state sentence for driving while barred.[13]  A 360 month sentence is an astounding 10,950 times longer than Amaya's longest previous sentence. This incredibly large disparity is grossly in excess of that needed to accomplish deterrence. Moreover, if Amaya is sentenced to 180 months imprisonment, he will be at least 38 years old when he is released. The Sentencing Commission has found that recidivism rates decline relatively consistently as age increases. *See* U.S. SENTENCING COMMISSION, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FED-

---

13.  Amaya's other convictions resulted in only  fines.

ERAL SENTENCING GUIDELINES 12, ex. 9 (2004). I find that a 180 month sentence is sufficiently lengthy to protect the public from Amaya's future crimes.

Finally, during a lengthy sentence, Amaya will have the opportunity to undergo extensive drug treatment in the Residential Drug Abuse Program (RDAP) and to take advantage of vocational training opportunities offered by the Bureau of Prisons.[14] Amaya has never undergone drug treatment but is willing to participate in the RDAP program. Amaya's successful completion of drug treatment combined with new vocational skills would increase his employment possibilities upon release and substantially decrease the likelihood of his recidivism.

### 5. The kinds of sentences available

The third § 3553(a) factor is "the kinds of sentences available," see 18 U.S.C. § 3553(a)(3), and the fourth is "the kinds of sentence and the sentencing range established" for similar offenses. 18 U.S.C. § 3553(a)(4). I have reviewed the sentencing options discussed in the PSR, including custody, supervised release, probation, fines, restitution, and denial of federal benefits. PSR at 17–19. In this case, the kinds of sentences available are largely circumscribed by the 120 month mandatory minimum sentence required by Amaya's

drug offense conviction. See 21 U.S.C. § 841(b)(1)(A).[15.]

### 6. Any pertinent policy statement

The fifth § 3553(a) factor is "any pertinent policy statement." 18 U.S.C. § 3553(a)(5). The parties have not directed me to any pertinent policy statement, or asked me to apply one, and I am unaware of any that apply.

### 7. The need to avoid unwarranted sentencing disparity

The sixth § 3553(a) factor is "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In United States v. Beiermann, 599 F.Supp.2d 1087 (N.D.Iowa 2009), I noted that a concomitant of this principle is the need to avoid unwarranted similarities among defendants who are not similarly situated. See Beiermann, 599 F.Supp.2d at 1115–16 (citing Gall, 552 U.S. at 55, 128 S.Ct. 586, which recognizes the "need to avoid unwarranted similarities among other co-conspirators who were not similarly situated").

The following chart compares the criminal histories, offense levels, sentencing ranges, and sentences received by the co-defendants in this case.[16]

---

14. The RDAP program is an intensive drug treatment program where inmates live in separate housing and participate in half-day treatment and half-day school, work, or vocational programs. Most inmates accepted into the RDAP spend nine months in the program. See BUREAU OF PRISONS, Substance Abuse Treatment, http://bop.gov/inmate_programs/substance.jsp. "Research findings demonstrated that RDAP participants are significantly less likely to recidivate and less likely to relapse to drug use than non-participants. The studies also suggest that the Bureau's RDAPs make a significant difference in the lives of inmates following their release from custody and return to the community." Id.

15. Amaya did not raise a policy disagreement with the methamphetamine guidelines as an additional ground for a downward variance. See United States v. Hayes, 948 F.Supp.2d 1009, 1029-33, 2013 WL 2468038, at *20–22 (N.D.Iowa June 7, 2013) (granting downward variance based on my policy disagreements with the methamphetamine guidelines). Even if defense counsel had raised this ground, it would not have resulted in a different sentence for Amaya.

16. Javier Amaya is awaiting trial.

| Defendant | Criminal History | Offense Level | Sentencing Range | Sentence Received |
|---|---|---|---|---|
| Octavio Noris | I | 19 | 30–37 | 30 |
| Eduardo Deanda | I | 19 | 30–37 | Time served |
| Jorge Aguilar | I | 23 | 46–57 | 24 |
| Amaya | I | 42 | 360 to life | XX |
| Shawn Forbes | II | 25 | 63–78 | 39 |

These four co-defendants were subject to mandatory minimum sentences, 60 months for Noris, Deanda, and Forbes, and 120 months for Aguilar. Three of the four were able to have their guideline range reduced and the mandatory minimum sentence waived because they were safety valve eligible, pursuant to 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2. All four also were able to lower their guideline range by acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. Three of the codefendants were also able to reduce their sentences through cooperation agreements with the prosecution.

The prosecution argues that Amaya and these co-defendants are not similarly situated for sentencing purposes because all three pleaded guilty, accepted responsibility for their wrongdoing, cooperated with the prosecution, and testified at trial. Accordingly, the prosecution contends that comparing Amaya to these three codefendants is comparing apples to oranges. Courts have recognized that co-defendants are not "similarly situated", within the meaning of § 3553(a)(6), when one pleads guilty and cooperates with the prosecution, and the other forces the prosecution to take the time and expense of going to trial. See United States v. Susi, 674 F.3d 278, 288 (4th Cir.2012) (holding that the "avoidance of unwarranted sentencing disparities does not require courts to sentence similarly individuals who go to trial and those who plead guilty. They are not similarly situated for sentencing purposes."); United States v. Mitchell, 421 Fed.Appx. 102, 105–106 (2d Cir.2011) (observing that "defendants were not similarly situated to the co-conspirators they identify, since those defendants who pled guilty did so pursuant to plea agreements which dramatically reduced their Guidelines exposure."); United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir.2009) ("defendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial."); United States v. Perez–Pena, 453 F.3d 236, 243 (4th Cir.2006) ("[C]omparing the sentences of defendants who helped the Government to those of defendants who did not ... is comparing apples and oranges. For this reason, Congress could not have intended that disparities resulting from the exercise of prosecutorial discretion could be determined to be 'unwarranted.' "); United States v. Vazquez–Rivera, 470 F.3d 443, 449 (1st Cir.2006) (citation omitted) ("[A] defendant who chooses to enter into a plea bargain is not similarly situated to a defendant who contests the charges."); United States v. Flores, 454 F.3d 149, 163 (3rd Cir.2006) (holding that defendant's co-defendants were not similarly situated because codefendant "had been involved in the conspiracy for a shorter time, opened fewer corporations, was not an attorney, and had accepted responsibility and pled guilty rather than going to trial."). I recognize that these three co-defendants are not similarly situated with Amaya because they have all pleaded guilty, accepted responsibility for their wrongdoing, cooperated with the prosecution, and testified at trial.

Notwithstanding the differences between Amaya and his co-defendants, sentencing Amaya to a sentence within his

advisory guideline range is too harsh and creates unwarranted sentencing disparities among defendants who have engaged in the same criminal conduct. *See United States v. Martin,* 520 F.3d 87, 94 (1st Cir.2008) ("[D]istrict courts have discretion, in appropriate cases, to align co-defendants' sentences somewhat in order to reflect comparable degrees of culpability— at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system."). A 180 month sentence is still far greater than the sentences given Amaya's co-defendants and results in the strange sentencing anomaly that his sentence will be greater than all four co-defendants combined. Sentencing Amaya to a much longer sentence within his advisory guideline range would unduly exacerbate the disparity, run counter to § 3553(a)(6), and create a gross sentencing disparity.

### 8. *The need to provide restitution*

The final § 3553(a) factor is "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). This factor does not apply.

### 9. *Double jeopardy violation*

Finally, I consider Amaya's argument that I should "consider the double jeopardy violation as a factor that would justify a variance down to 120 months." Defendant's Br. at 6. He argues that the prosecution has not been sanctioned for causing two mistrials while the resulting delays have subjected him to "embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity for months." Defendant's Br. at 7. The prosecution asserts that Amaya's argument does not support a downward variance because I have never found a double jeopardy violation in this case. The prosecution is correct.

On December 19, 2011, the first day of our second attempt to try this case, de-

fense counsel informed me that the prosecution's discovery file did not include any information regarding the use of GPS devices to collect evidence in this case. Defense counsel reported that they had only become aware of the use of a GPS device on Amaya's vehicle through the testimony of the prosecution's first witness. The defendants then orally moved for a mistrial, which the prosecution opposed. I granted the defendants' motion for mistrial. The defendants then orally moved to dismiss the case with prejudice. After receiving briefing from the parties, I denied the defendants' motion for mistrial on January 26, 2012, after finding that there was no evidence that the prosecution intended to "goad" the defendants into moving for a mistrial. *See* Memorandum Opinion And Order Regarding Defendants' Oral Motion To Dismiss With Prejudice at 2. Thus, I have never found a double jeopardy violation and conclude that the circumstances of either or both of the mistrials do not warrant a downward variance.

### 10. *Consideration*

After considering the § 3553(a) factors, I grant Amaya's variance motion based on my individualized assessment of the § 3553(a) factors. Specifically, I find that a sentence of 180 months imprisonment, followed by 120 months of supervised release is "sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a). First, I have considered the nature and circumstances of the offense in arriving at this sentence. A substantially mitigating circumstance in this case is that there is absolutely no evidence indicating that Amaya's participation in these crimes involved any violence. Next, I have considered Amaya's history and characteristics in arriving at this sentence. Amaya is not a hardened, recidivist criminal. He is only 25 years old and his criminal record is

limited to four, non-violent, misdemeanor convictions. Amaya's age and limited criminal record indicate an ability to be rehabilitated. I find that Amaya's history and characteristics warrant no more punishment than a 180 month sentence.

A 180 month sentence is sufficient to reflect the seriousness of the offenses and takes into account that this is Amaya's first drug offense conviction. In contrast, the advisory guideline range for Amaya of 360 months (30 years) to life is grossly excessive to achieve the goals of sentencing. A 180 month sentence does not create unwarranted sentencing disparities.

This sentence, while below that called for by the Guidelines, is still thousands of times longer than Amaya's only previous term of incarceration, and thus sufficient to deter him. Moreover, imprisonment is not the only manner in which Amaya is being punished. I am also sentencing Amaya to 120 months of supervised release, doubling the minimum time called for under the Guidelines. The Supreme Court has recognized that a term of supervised release involves a "substantial restriction of freedom." *Gall,* 552 U.S. at 48, 128 S.Ct. 586. Offenders on supervised release, like the probationer in *Gall,* "may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking." *Id.* Ten years on supervised release ensures that Amaya will receive the supervision he needs after he leaves prison, and permits me to incarcerate him in the future should he fail to comply with the terms of his supervised release.

A sentence of 180 months is a substantial amount of time to spend in prison and is sufficiently severe to promote respect for the law. This sentence is also sufficiently lengthy to deter others. In contrast to the advisory guideline range, a sentence of this length will enhance the public's confidence in the criminal justice system and not breed disrespect for it.

### III. CONCLUSION

For all of the reasons stated above, after considering all of the § 3553(a) factors, I find that a sentence within the advisory guideline range does not serve those factors and is greater than necessary to comply with the purposes of § 3553(a). Thus, I vary downward from the advisory guideline sentencing range of 360 to life for Amaya's offenses to 180 months. I conclude that a sentence of 180 months is "sufficient, but not greater than necessary" to achieve the purposes of § 3553(a). Therefore, I grant Amaya's motion for downward variance and impose a sentence of 180 months imprisonment followed by 120 months of supervised release.

**IT IS SO ORDERED.**